[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 99-2214

_____

D. C. Docket No. 98-00052 CR-ORL-19C

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 12, 2002
THOMAS K. KAHN
CLERK

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

HERMAN VENSKE, BRIAN HIGGINS,
WILLIAM J. McCORKLE, CHANTAL McCORKLE,

Defendants-Appellants.

_____

No. 01-10345

_____

D. C. Docket No. 98-00052 CR-ORL-19

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

WILLIAM J. McCORKLE, a.k.a. William T. McCokle,
CHANTAL McCORKLE,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Middle District of Florida
_____
**(July 12, 2002)**

Before TJOFLAT, RONEY and COX, Circuit Judges.

COX, Circuit Judge:

William McCorkle, Chantal McCorkle, Brian Higgins, and Herman Venske (the "Defendants") appeal their convictions and sentences for their participation in a fraudulent telemarketing scheme. William and Chantal contend that the court erred in denying their motions for a new trial and an evidentiary hearing based on allegations of juror misconduct and extrinsic influence on jurors. Because we find that the court did not abuse its discretion in denying their motions, we affirm their convictions. Nevertheless, because we conclude that the court erred in sentencing William and Chantal on a count charging a multiple-object conspiracy without determining beyond a reasonable doubt which offense was the object of the conspiracy, we vacate their sentences and remand for resentencing. We affirm the convictions and sentences of Higgins and Venske.

I.    *Background*

2

The Defendants were involved in a telemarketing scheme involving the use of "infomercials" to sell William's system for getting rich by purchasing distressed real estate and items at government auctions. William's system was sold in various product forms. His basic product was the "Fortunes in Foreclosures" package, consisting of videotapes and literature explaining William's system. His more advanced products included the "Whole Enchilada," the boot-camp, and the government auction packages, all of which consisted of videotapes and literature on William's system.

The Government presented evidence at trial showing that, in the infomercials promoting William's products, William and Chantal made numerous misrepresentations and false statements. For example, William stated that he had made millions of dollars by purchasing distressed real estate when he had only recently filed a Chapter 11 bankruptcy petition. William and Chantal also appear in the infomercials and on the infomercial packaging with items they supposedly purchased at government auctions in the background, such as a luxury car and a yacht and a jet bearing the name "William J. McCorkle." The luxury car was not purchased at a government auction, and the yacht and the jet were leased by Chantal for the day of filming the infomercial.

In addition, William stated in the infomercials that he would partner with purchasers of distressed properties and fund their purchases at government auctions. Although thousands of William's products were sold, William entered into only a handful of these partnered transactions. William also stressed that his product came with a thirty-day money-back guaranty, but most unsatisfied customers were unable to get their money back because William instructed his employees to issue only a limited number of refunds. William and Chantal also interviewed persons in the infomercials whom they described as satisfied customers when, in fact, these were paid actors using prepared scripts that falsely accounted their success using William's products.

The McCorkles operated their business under the name Cash Flow Systems, Inc. Chantal served as president of Cash Flow Systems, supervising human resources, the handling of accounts, and the company's expenses. Venske worked at Cash Flow Systems in the inbound department, fielding incoming phone calls from existing and potential customers. Venske prepared scripts, based in part on false information, that he and other employees used to "up-sell" these customers into William's more expensive products. Higgins worked at Cash Flow Systems as the director of the outbound department. Similar to Venske, Higgins prepared scripts, based in part on false information, that he and others used in placing outgoing calls to potential

customers to "up-sell" them into more expensive products. Venske and Higgins also participated in live seminars where they made false statements and misrepresentations about William's system to those in attendance.

In order to receive credit-card payments from their customers, William and Chantal opened various merchant bank accounts to process these payments. In opening several of these accounts, William and Chantal made false statements and misrepresentations about themselves and their business. The proceeds from the sale of William's products were deposited in these merchant bank accounts, and, once deposited, William and Chantal authorized numerous wire transfers of these funds to other accounts. Some of the accounts to which the money was wired were located in the Cayman Islands, and after investigations into Cash Flow Systems commenced, William and Chantal transferred money out of their accounts in the United States and into their accounts in the Caymans.

Based on the Defendants' involvement in this scheme, each of them was charged in a multi-count superseding indictment with conspiracy to commit mail and wire fraud. William, Chantal, and Higgins were charged in a count with conspiracy to launder money, alleging violations of 18 U.S.C. §§ 1956(a)(1)(A)(i) and 1956(a)(1)(B)(i) as the objects of the conspiracy. William and Chantal were also charged in various counts with substantive offenses of money laundering, using

fraudulently obtained credit cards, and using a false social security number. In addition, William was charged in several counts with substantive offenses of mail fraud, and Chantal was charged with making a false declaration in court.

Following a two-month jury trial, each of the Defendants was found guilty of conspiracy to commit mail and wire fraud. William and Chantal also were convicted of conspiracy to launder money, money laundering, using fraudulently obtained credit cards, and using a false social security number. Additionally, William was convicted on several counts charging substantive mail fraud offenses, and Chantal was convicted of making a false declaration in court. Higgins was acquitted of conspiracy to launder money.

The court then sentenced Venske and Higgins to 60 months' imprisonment on their convictions for conspiracy to commit mail and wire fraud. William and Chantal were each sentenced to 292 months' imprisonment on their convictions. In sentencing William and Chantal, the court applied the grouping rules of Chapter 3, Part D of the Sentencing Guidelines and sentenced them according to the offense guideline for the money laundering offenses. Although the jury's general verdict on the count charging conspiracy to launder money did not specify which of the alleged offenses was the object of the conspiracy, the court calculated William's and Chantal's base offense levels using the more serious of the alleged offenses.

After sentencing, William, Chantal, Venske, and Higgins filed motions for a new trial and an evidentiary hearing based on newly discovered evidence. The newly discovered evidence consisted of two affidavits of private investigators alleging juror misconduct and extrinsic influence on jurors. The first of these affidavits was from a private investigator named William Porter. The Porter Affidavit relates statements made by Elizabeth Taylor, the ex-fiancee of juror Kevin Hart. The affidavit states that Taylor made the following statements concerning Hart: (1) prior to Hart being selected to serve on the jury, she informed Hart that her mother had purchased one of William's products; (2) Hart knew from the first day of trial that the McCorkles were guilty; (3) Hart and other jurors passed notes during trial making fun of some witnesses; (4) one of the jurors did not want to vote guilty, but Hart and another juror convinced her otherwise; and (5) Hart spoke openly with non-jurors about the trial and expressed his belief that the McCorkles were guilty and his hatred of William's lawyer, F. Lee Bailey. (R.20-877-Ex. B at 1-2.)

The second affidavit filed by the Defendants in support of their motions was from Fred Roberts, also a private investigator. The Roberts Affidavit consisted of statements allegedly made by the jury foreman, Mark McDaniel, during an interview conducted by Roberts. Roberts allegedly interviewed McDaniel as part of a book-

writing project sponsored by William's brother-in-law. In his affidavit, Roberts

testified to the following statements made by McDaniel during the interview:

> [A court bailiff] had told the jury members that one of McCorkle's witnesses was a witness for the defense attorney, [F. Lee] Bailey, when Bailey was a defense attorney in the "son of Sam" case. McDaniel said that [the bailiff] told them that the witness had asked why he was a witness in the McCorkle case because he had never bought into the McCorkle plan.
>
> . . . .
>
> McDaniel said that [the bailiff] had told the jury they would not have any trouble convicting McCorkle if they knew what he knew. McDaniel said that he believed that [the bailiff] meant that he had heard information in the case that the jury had not heard.

(R.20-877-Ex. A at 1-2.)

After considering the Defendants' motions and the supporting affidavits, the

court denied William's and Chantal's motions and granted evidentiary hearings to

Higgins and Venske on their motions. The court ruled that, with regards to the Porter

Affidavit, it would not consider any portions of the affidavit relating to the jury's

internal workings and deliberative process pursuant to Fed. R. Evid. 606(b).[1] The

---

[1] Rule 606(b) provides that:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the

8

court then ruled that the remaining  portions of the affidavit, which it believed

arguably might be considered under Rule 606(b),[2] failed to satisfy the Appellants'

burden of coming forward with credible and persuasive evidence of juror misconduct.

With regards to the Roberts Affidavit, on the other hand, the court ruled that the

allegations concerning the bailiff's comments, *if properly presented*, warranted further

inquiry. (R.21-912 at 11.)  The court, however, was not satisfied that the affidavit was

presented properly because it may have been obtained in violation of M.D. Fla. R.

5.01(d) (hereinafter "Local Rule 5.01(d)"), which prohibits attorneys or litigants from

directly or indirectly contacting jurors absent prior court approval, and an earlier order

from the court directing the parties to Local Rule 5.01(d).[3]  Thus, the court reserved

---

juror's mental process in connection therewith, except that a juror may
testify on the question whether extraneous prejudicial information was
improperly brought to the jury's attention or whether any outside
influence was improperly brought to bear upon any juror.  Nor may a
juror's affidavit or evidence of any statement by the juror concerning
a matter about which the juror would be precluded from testifying be
received for these purposes.

[2]     These portions included Taylor's statements that juror Hart discussed
his opinion of the McCorkles' guilt with other jurors, that he openly discussed the
case with non-jurors, and that she informed Hart that her mother had purchased one
of William's products.

[3]     Local Rule 5.01(d) provides that:

No attorney or party shall undertake, directly or indirectly, to
interview any juror after trial in any civil or criminal case except as
permitted by this Rule.  If a party believes that grounds for legal

ruling on the merits of the motions and held an evidentiary hearing on the circumstances surrounding the post-trial contact with jurors.

At the evidentiary hearing, the court heard testimony from, *inter alia,* William, Chantal, Roberts, and Porter. The court discredited testimony that the juror interviews were conducted as part of a book-writing project, and found that William and Chantal, along with members of William's family and the private investigators, "knowingly and intentionally engaged in a scheme to defy the law precluding post-verdict juror interviews without prior permission of the Court." (R.22-972 at 34.) Accordingly, the court ruled that it would not consider the Roberts Affidavit with respect to William

----

challenge to a verdict exist, he may move for an order permitting an interview of a juror or jurors to determine whether the verdict is subject to the challenge. The motion shall be served within ten (10) days after rendition of the verdict unless good cause is shown for the failure to make the motion within that time. The motion shall state the name and address of each juror to be interviewed and the grounds for the challenge that the moving party believes may exist. The presiding judge may conduct such hearings, if any, as necessary, and shall enter an order denying the motion or permitting the interview. If the interview is permitted, the Court may prescribe the place, manner, conditions, and scope of the interview.

M.D. Fla. R. 5.01(d).

The court entered an order on January 28, 1999 directing the parties and their counsel to Local Rule 5.01(d). (R.13-538.) The record does not indicate what prompted the court to enter this order.

and Chantal.[4]  The Roberts Affidavit thus excluded, the court ruled that William and Chantal failed to offer sufficient evidence in support of their motions.  Accordingly, the court denied their motions for a new trial and an evidentiary hearing.

## II.  *Issues on Appeal*

While the Defendants raise numerous issues on appeal, only two warrant discussion: (1) whether the court erred in denying William's and Chantal's motions for a new trial and an evidentiary hearing based on alleged juror misconduct and extrinsic influence on jurors; and (2) whether the court erred in sentencing William and Chantal for the money laundering conspiracy without first determining beyond a reasonable doubt which money-laundering offense they conspired to commit.  We affirm relative to the to the remaining issues without discussion.  *See* 11th Cir. R. 36-1.[5]

---

[4]    The court found that neither Higgins nor Venske were involved in improper post-trial communications with the jurors.  Accordingly, the court did not exclude the Roberts Affidavit with respect to either defendant, and it granted them an opportunity for an evidentiary hearing on their motions for a new trial.  Neither Higgins nor Venske availed themselves of that opportunity, however.

[5]    These issues are whether: (1) the court erred by increasing William's offense level for obstruction of justice; (2) the court failed to comply with the Jury Selection Act; (3) the evidence is sufficient to support the verdicts against Chantal, Venske, and Higgins; (4) the court erred in instructing the jury; (5) the court erred by admitting into evidence Chantal's affidavit filed in an earlier proceeding, the McCorkles' personal and corporate tax returns, and evidence relating to the credit-card fraud; (6) the court erred by limiting the testimony of satisfied customers; (7)

III.    *Standards of Review*

We review the court's factual finding that William and Chantal indirectly engaged in post-trial contact with jurors for clear error. *See United States v. Jackson*, 276 F.3d 1231, 1233 (11th Cir. 2001). We review the court's order denying William's and Chantal's motions for a new trial and an evidentiary hearing based on alleged juror misconduct and extrinsic influence on jurors for abuse of discretion. *See United States v. Cuthel*, 903 F.2d 1381, 1382 (11th Cir. 1990). Since William and Chantal contend for the first time on appeal that the court erred in sentencing them for the money laundering conspiracy, our review on this issue is for plain error. *See United States v. Harness*, 180 F.3d 1232, 1234 (11th Cir. 1999).

IV.    *Discussion*

---

the court erred in declining to sever Venske's and Higgins' trials; (8) the court erred by sentencing Venske for the entire amount of loss attributable to the conspiracy to commit mail and wire fraud; and (9) the court erred in denying Higgins' motion for a mistrial.

We do not reach William's issues alleging a conflict of interest between him and his trial attorney, F. Lee Bailey, arising out of Bailey's taking of a fee from a legal trust fund and Bailey's implication in William's criminal conduct. Because these issues were not raised below, the record is not sufficiently developed for our review. In addition, since we vacate and remand for resentencing of William and Chantal based on the court's failure to find beyond a reasonable doubt which offense was the object of the money laundering conspiracy, we will not decide whether it was appropriate for the court to enhance their sentences based on gross business receipts.

A.

William and Chantal contend that the court abused its discretion by denying their motions for a new trial and an evidentiary hearing on the basis of alleged juror misconduct and extrinsic influence on jurors. According to William and Chantal, since their motions demonstrate a colorable showing of extrinsic influence, the court erred by not conducting an evidentiary hearing on their motions. For the reasons discussed below, we disagree.

The only evidence offered by William and Chantal in support of their motions for a new trial and an evidentiary hearing consisted of the Porter and the Roberts Affidavits. With respect to the Porter Affidavit, all but two of the statements contained therein are excluded by Fed. R. Evid. 606(b) because they involve the jury's deliberative process and the mental impressions of juror Hart. The two statements that might arguably fall outside the scope of Rule 606(b) are: (1) Porter's statement that Taylor informed juror Hart, her ex-fiancé, that her mother had purchased William's product; and (2) Porter's statement that Taylor said she observed juror Hart talking openly with non-jurors about his belief that the McCorkles were guilty and his hatred toward William's lawyer, F. Lee Bailey. We cannot say, on the record presented to us, that either of these statements show extrinsic influence on Juror Hart or any other juror. Porter's Affidavit does not allege that Hart was influenced by these external

13

communications, and neither William nor Chantal offer any other evidence to show that juror Hart was influenced in any way. *See United States v. Watchmaker*, 761 F.2d 1459, 1465 (11th Cir. 1985) (recognizing that "failure to hold a hearing constitutes an abuse of discretion only where there is evidence that the jury was subjected to influence by outside sources."). *Cf. United States v. Barshov*, 733 F.2d 842, 851 (11th Cir. 1984) (recognizing that trial court is obligated to conduct evidentiary hearing only when defendant makes "a colorable showing of extrinsic influence . . . ."). Thus, the court did not abuse its discretion in concluding that the Porter Affidavit is not sufficient evidence of juror misconduct or extrinsic influence on the jury.

The allegations in the Roberts Affidavit, on the other hand, clearly involve extrinsic communications that, if properly presented to the district court, necessitate further inquiry. *See e.g., Parker v. Gladden*, 385 U.S. 363, 363, 365, 87 S. Ct. 468, 470-71 (1966) (reversing conviction where bailiff said of defendant to juror "[o]h, that wicked fellow, he is guilty."). The question that we must initially address, however, is whether the court erred in finding that the Roberts Affidavit was obtained in violation of Local Rule 5.01(d). This is a factual finding that we reverse only if clearly erroneous. *See United States v. Floyd,* 281 F.3d 1346, 1348 (11th Cir. 2002).

Having considered the briefs and the relevant portions of the record, we

conclude that the court's finding was not clearly erroneous. The court heard testimony from which it could have concluded that William and Chantal were involved indirectly in interviewing the jury foreman in clear violation of Local Rule 5.01(d). Moreover, after hearing testimony from William and Chantal that they were not involved in the improper juror contact, the court was entitled to infer the opposite from their testimony. *See United States v. Allison,* 908 F.2d 1531, 1535 (11th Cir. 1990). Thus, the court did not clearly err in finding that William and Chantal indirectly were involved in the improper juror contact.

The issue that we must now resolve is whether the court abused its discretion by excluding the Roberts Affidavit with respect to William and Chantal in light of its finding that they violated Local Rule 5.01(d). In excluding the affidavit, the court concluded that "a criminal defendant must not be allowed to benefit from evidence he or she caused to be obtained in violation of the prohibitions against unauthorized post-verdict contact of jurors." (R.22-972 at 42.) William and Chantal contend that, regardless of whether the post-verdict contact was improper, the exclusion of the Roberts Affidavit violates their Sixth Amendment constitutional right to trial by an impartial jury, and that they are entitled to an evidentiary hearing to determine if the jury was influenced by the comments the bailiff is alleged to have made. William also contends that courts do not have the power to enact rules such as Local Rule 5.01(d)

or to exclude evidence obtained in violation of such rules. We disagree. To begin with, it is well settled that district courts have the power to make rules and issue orders prohibiting attorneys and parties from contacting jurors, whether directly or indirectly, absent prior court approval. *See e.g., United States v. Davila*, 704 F.2d 749, 754 (5th Cir. 1983) (recognizing validity of these rules and noting that their principal purpose is to prevent "fishing expeditions in search of information with which to impeach jury verdicts."); *United States v. Moten*, 582 F.2d 654, 665 (2nd Cir. 1978) (recognizing power of trial judge to order all post-verdict investigation of jurors to be conducted under his supervision). Concomitant with the district court's power to make rules and issue orders is the power to enforce those rules and orders. *See Magluta v. Samples*, 162 F.3d 662, 664 (11th Cir. 1998). And, where attorneys or parties obtain evidence in violation of the court's rules or orders, the court may exercise its power to enforce those rules and orders by excluding the evidence wrongfully obtained. *See e.g., United States v. Gonzales*, 164 F.3d 1285, 1291 (10th Cir. 1999) (recognizing that "courts have discretion to exclude evidence as a sanction for violation of a discovery order.").

Moreover, when defendants engage in post-verdict contact with jurors, the district court's use of these powers is informed by interests important to the integrity of the judicial process. One such interest is the court's strong interest in protecting

16

jurors from threats and needless harassment from unsuccessful parties. *McDonald v. Pless*, 238 U.S. 264, 267, 35 S. Ct. 783, 784 (1915) (recognizing that jurors should be protected from being "harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict."). Indeed, this circuit's pattern instruction dealing with the jury's duty to deliberate specifically instructs the jury that "[y]our deliberations will be secret; you will never have to explain your verdict to anyone." *Eleventh Circuit Pattern Jury Instructions, Criminal Cases*, Basic Instruction No. 11 (West 1997). Equally important is the court's interest in preserving the finality of the jury's verdict. *See Tanner v. United States*, 483 U.S. 117, 120, 107 S. Ct. 2739, 2747 (1987) (recognizing that post-verdict investigation "seriously disrupt[s]" finality of process).

The court's ruling excluding the Roberts Affidavit directly furthered these interests, and the integrity of the judicial process, by not permitting defendants to benefit from evidence obtained through improper contact with jurors. We therefore conclude that it was a permissible sanction. To conclude otherwise would allow defendants facing imprisonment to contact jurors at will in an effort to obtain information that might upset the jury's verdict. Many jurors would no doubt feel threatened or intimidated by such contacts, and excluding evidence that is improperly obtained from jurors effectively deters such contacts and preserves the integrity of our

17

judicial process. *Cf. United States v. Soto-Soto*, 598 F.2d 545, 550 (9th Cir. 1979) (recognizing that exclusion of evidence obtained in violation of statute serves as only effective deterrent of such violations). For these reasons, we conclude that the court did not abuse its discretion in excluding evidence that was obtained in violation of Local Rule 5.01(d). *See Tanner*, 483 U.S. at 126, 107 S. Ct. at 2750 (recognizing in dicta that "[t]he juror affidavit submitted in support of the second new trial motion was obtained in clear violation of the District Court's order and the court's local rule against juror interviews . . . ; *on this basis alone the District Court would have been acting within its discretion in disregarding the affidavit.*") (emphasis added); *Arney v. Helbig,* 383 N.W. 2d 4, 6 (Minn. Ct. App. 1986) (affirming court's denial of hearing to plaintiff where his attorney conducted improper juror interview and recognizing state's policy to decline hearings based on information improperly obtained from jurors); *cf. Rakes v. United States*, 169 F.2d 739, 745-46 (4th Cir. 1948) (stating in slightly different context that "[h]e who makes studied inquiries of jurors . . . acts at his peril, . . . [and] [i]t is incumbent upon the courts to protect jurors from [such inquiries]."). Absent that evidence, William and Chantal failed to make an adequate showing of juror misconduct or extrinsic influence on the jury. Accordingly, the court did not abuse its discretion in denying their motions for a new trial and an evidentiary hearing.

William and Chantal next challenge their sentences for conspiracy to launder money. Count 17 charges two offenses as the objects of the money laundering conspiracy: (1) conducting financial transactions with the proceeds of the telemarketing scheme with the intent of promoting the scheme, in violation of 18 U.S.C. § 1956(a)(1)(A)(i); and (2) knowingly concealing the proceeds of the scheme, in violation of 18 U.S.C. § 1956(a)(1)(B)(i). The court correctly instructed the jury that it could return a guilty verdict so long as it found beyond a reasonable doubt that the defendant conspired to commit either of the offenses charged in Count 17. Following deliberations, the jury returned a general verdict of guilty. At sentencing, the court, without determining beyond a reasonable doubt which of the charged offenses was the basis of the jury's verdict, calculated William's and Chantal's sentences using the more severe base offense level associated with the § 1956(a)(1)(A)(i) offense. For the first time on appeal, William and Chantal contend that this was error.

Since William and Chantal did not timely preserve this issue for appeal, we review only for plain error. *See United States v. Aguillard*, 217 F.3d 1319, 1321 (11th Cir. 2000). Our review is limited to determining whether there is error, that is plain, that affects substantial rights, and that "seriously affect[s] the fairness, integrity, or

19

public reputation of judicial proceedings." *United States v. Sanchez*, 269 F.3d 1250, 1281 (11th Cir. 2001) (en banc) (quoting *United States v. Olano*, 507 U.S. 725, 732, 113 S. Ct. 1770, 1776 (1993)). Thus reviewed, we conclude that the court committed plain error.

The court's failure to determine which money laundering offense formed the object of the conspiracy constitutes error under both the Sentencing Guidelines and this court's decision in *United States v. McKinley*, 995 F.2d 1020, 1025-26 (11th Cir. 1993). Section 1B1.2(d) of the Sentencing Guidelines[6] provides that, in situations such as this, where a defendant has been convicted on a count charging conspiracy to commit multiple object offenses, the conviction "shall be treated as if the defendant had been convicted on a separate count of conspiracy for each offense that the defendant conspired to commit." USSG § 1B1.2(d). In the commentary to § 1B1.2(d), Congress cautioned in Application Note 5 that:

> [p]articular care must be taken in applying subsection (d) because there are cases in which the verdict . . . does not establish which offense(s) was the object of the conspiracy. In such cases, subsection (d) should only be applied with respect to an object offense alleged in the conspiracy count *if the court, were it sitting as a trier of fact, would convict the defendant of conspiring to commit that object offense*.

USSG § 1B2.1(d) comment (n.5) (emphasis added).

---

[6] We apply the version of the Sentencing Guidelines in effect when William and Chantal were sentenced — i.e. those effective on November 1, 1998.

Our decision in *McKinley* squarely confronted, in a factual context strikingly similar to that at issue here, the applicability of § 1B1.2(d) and Application Note 5. The defendants in *McKinley* were convicted on a count charging a conspiracy to commit multiple offenses, and the jury's verdict did not specify which of the offenses the defendants conspired to commit. Under those circumstances, we held that § 1B1.2(d) and Application Note 5 require the sentencing judge to determine beyond a reasonable doubt which offense the defendant conspired to commit. *McKinley*, 995 F.2d at 1026; *accord United States v. Ross*, 131 F.3d 970, 990 (11th Cir. 1997). Thus, the court's failure to make such a determination in this case was error, and in light of our decision in *McKinley*, the error was plain.

Furthermore, the court's error affects William's and Chantal's substantial rights and the fairness, integrity, and public reputation of judicial proceedings. In sentencing William and Chantal, the court applied the grouping rules of Chapter 3, Part D of the Sentencing Guidelines, and arrived at two separate groups of closely related counts — the "fraud group" and the "money laundering group." Because the money laundering group produced an adjusted offense level of 40, which was the higher level of the two groups, the court applied that level in calculating William's and Chantal's sentences. In calculating the base offense level for the money laundering group, the court applied a base offense level of 23, which is mandated by the Guidelines if the

21

object of the money laundering conspiracy is a violation of § 1956(a)(1)(A)(i). *See*

USSG § 2S1.1(a)(1).[7] If the object of a money laundering conspiracy is a violation

of § 1956(a)(1)(B)(i), however, the Guidelines provide for a base offense level of 20.

*See* USSG § 2S1.1(a)(2). Thus, had the court sentenced William and Chantal using

a base offense level of 20 rather than 23, and assuming all other elements of the

sentence stayed the same, their total adjusted offense levels would have been 37 rather

than 40. This would have reduced the guideline range of their sentences from a

minimum of 292 months' imprisonment to a maximum of 262 months'

imprisonment.[8] Accordingly, we conclude that the court's error affects William's and

Chantal's substantial rights and the fairness, integrity, and public reputation of judicial

proceedings. *See United States v. Harness*, 180 F.3d 1232, 1235 (11th Cir. 1999)

(reviewing for plain error and vacating defendant's sentence where court erroneously

enhanced defendant's sentence by 2 levels).

---

[7]     Section 2X1.1(a) of the Guidelines provides that the base offense level for conspiracies is that from the guideline for the substantive offense.

[8]     William and Chantal were sentenced based on a criminal history category of I and an adjusted offense level of 40, which produced a guideline range of 292-365 months' imprisonment. Had William and Chantal been sentenced based on an offense level of 37, the guideline range for their sentences would have been 210-262 months' imprisonment.

Therefore, since the court plainly erred by failing to determine beyond a reasonable doubt which money laundering offense was the object of the conspiracy, we vacate William's and Chantal's sentences and remand for resentencing.[9]

---

[9] We do not address whether it was error for the court to enhance William's and Chantal's sentences for money laundering based upon gross business receipts since we do not yet know which offense the court will find they conspired to commit.

## V.    CONCLUSION

We affirm the convictions of William, Chantal, Venske, and Higgins.  We also affirm the sentences of Venske and Higgins.  Because the court erred in sentencing William and Chantal, we vacate their sentences and remand for re-sentencing.

AFFIRMED IN PART, VACATED AND REMANDED IN PART.