RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 17a0226p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

CARL L. ROBINSON (15-4098); CHRISTOPHER D. MARTIN (15-4100); SHANE K. FLOYD (15-4124),

*Defendants-Appellants.*

Nos. 15-4098/4100/4124

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 2:14-cr-00126—Algenon L. Marbley, District Judge.

Argued: June 14, 2017

Decided and Filed: September 29, 2017

Before: GIBBONS, ROGERS, and DONALD, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Yekaterina Reyzis, UNIVERSITY OF MICHIGAN LAW SCHOOL FEDERAL APPELLATE LITIGATION CLINIC, Ann Arbor, Michigan, for Appellant in 15-4098. Michaela Pickus, UNIVERSITY OF VIRGINIA LAW SCHOOL, Charlottesville, Virginia, for Appellant in 15-4100. Sandra J. Finucane, Gahanna, Ohio, for Appellant in 15-4124. Kimberly Robinson, UNITED STATES ATTORNEY'S OFFICE, Columbus, Ohio, for Appellee. **ON BRIEF:** Yekaterina Reyzis, Melissa M. Salinas, UNIVERSITY OF MICHIGAN LAW SCHOOL FEDERAL APPELLATE LITIGATION CLINIC, Ann Arbor, Michigan, for Appellant in 15-4098. Michaela Pickus, Stephen L. Braga, Alyson Sandler, UNIVERSITY OF VIRGINIA LAW SCHOOL, Charlottesville, Virginia, for Appellant in 15-4100. Derek A. Farmer, Gahanna, Ohio, for Appellant in 15-4124. Kimberly Robinson, UNITED STATES ATTORNEY'S OFFICE, Columbus, Ohio, for Appellee.

ROGERS, J., delivered the opinion of the court in which GIBBONS, J., joined, and DONALD, J., joined in part.  DONALD, J. (pp. 28–40), delivered a separate opinion concurring in part and dissenting in part.

---

**OPINION**

---

ROGERS, Circuit Judge.  Defendants appeal their criminal convictions arising out of a kickback scheme at a now-defunct community school in Dayton, Ohio.  Defendant Shane Floyd was superintendent at the school and defendant Christopher Martin was the chair of the school's board of directors.  Both used their positions to ensure that the school paid over $400,000 in consulting fees to Global Educational Consultants ("Global"), a company owned by defendant Carl Robinson.  Robinson, in turn, funneled money from Global's payments back to Floyd and Martin, such that Global continued to receive payments regardless of whether it provided poor-quality services or no services at all.  All three defendants were tried by jury, convicted, and now appeal on several grounds.  In light of the Supreme Court's recent decision in *Pena-Rodriguez v. Colorado*, 137 S. Ct. 855 (2017), defendants challenge the district court's failure to grant a new trial, or conduct an evidentiary hearing, on the basis of the jury foreperson's racially insensitive remarks to two African-American jurors during jury deliberations.  Although *Pena-Rodriguez* permitted, in very limited circumstances, inquiry into a jury's deliberations, this case does not fit into these limited circumstances.  The defendants' other challenges are also without merit.

I.

Arise! Academy ("Arise") was a community school—Ohio's name for a charter school—in Dayton, Ohio.  Arise sought to provide a flexible, nontraditional curriculum to better serve students who were deemed at risk of dropping out of school.  By the summer of 2008, Arise faced declining enrollment, financial troubles, and scandal after its treasurer was indicted for embezzlement.  Accordingly, the school's sponsor under Ohio law sought a radical change in administration.  The sponsor elevated Arise's former principal, defendant Dr. Shane Floyd, to the role of superintendent, removed all existing board members, and appointed Floyd's

recommended candidates to take over the new board. The hope was that Floyd and the new board could turn the school around.

Instead, Floyd used his position at Arise to set up a kickback scheme. According to the Government, soon after Floyd was appointed as superintendent, he approached two former business partners, defendant Dr. Carl Robinson and Mike Ward, with a plan. Under this plan, Robinson would incorporate and be the owner of a new company, Global Educational Consultants, which would ostensibly provide management and education services to Arise. Ward, a former police officer, would be the "silent partner" in Global, and his role in the company would be concealed by Global's ownership structure. Floyd would then use his position as superintendent to ensure that Arise signed a contract with Global for educational and management services. The three men would split the proceeds of this contract: Ward and Robinson would each pay themselves up to $100,000 from the contract's proceeds per year—the amount Floyd was making in salary as superintendent of Arise—and all three men would split the remaining proceeds evenly.

The three men then put this scheme into effect. Floyd and the new board took over in July, 2008. According to documents filed with the Ohio Secretary of State, Robinson incorporated a company called Global Educational Consultants on July 28, 2008, disclosing himself as the owner but concealing Floyd's and Ward's involvement. By August 1, 2008, the newly formed Global signed a contract with Arise for various management and educational services. The contract was negotiated by Floyd and soon thereafter approved by the board. This contract initially obliged Arise to pay Global $264,000 for one year of consulting and management services, which came out to a payment of $22,000 each month.[1]

Each time Global was paid, Ward, Floyd, and Robinson would go to the bank together, where Robinson would deposit the check into Global's account and withdraw cash. The three men would then divide up the cash according to their agreement, sometimes at Floyd's house, and at least once in Floyd's car in the parking lot outside the bank. Floyd was instructed not to

---

[1]This $22,000 included $11,000 for services to Arise and $11,000 for services to PETE Academy, a separate community school located in the same building. PETE Academy merged with Arise in February 2009, but Global continued to receive payments for services to both Arise and PETE.

deposit the cash into a bank account "because it [could] be traced." Floyd apparently disregarded these instructions, allowing the government to eventually track this exchange of cash between the three men. For example, according to subsequently obtained bank records, on May 11, Robinson deposited a $40,000 check from Arise into Global's bank account. The next day, May 12, Robinson withdrew $5,000 in cash from the Global bank account, all in $20 bills. That same day, Floyd deposited $3,000 into his bank account, all in $20 bills. Similarly, a month later, on June 11, Robinson again deposited a $65,000 check from Arise into Global's bank account. The next day, June 12, Robinson took out a $5,000 cashier's check in Global's name and made the check out to Floyd. That same day, Floyd deposited the same cashier's check into his account. Another month later, on July 15, Robinson deposited a $66,000 check from Arise into Global's bank account. The next day, July 16, Robinson withdrew $6,000 in cash, all in $100 bills. That same day, Floyd deposited $2,200 into his bank account, all in $100 bills.

Global soon found that it had to pay off Arise board members in order to ensure prompt payments under the Global-Arise contract. Though selected by Floyd, Arise Board Chair Brian Moore initially held up payments to Global, questioning why the consulting company was paid so much under the contract. Robinson reportedly told Ward to pay Moore in exchange for his approving payments to Global in a timely manner. Moore initially refused to accept the payments, but changed his mind after Ward offered him an initial $1,000 in cash in a gas station parking lot sometime in January or February of 2009. Global was then back-paid for several months of missed payments and paid monthly from then on. Soon thereafter, Moore quit his position as Board Chair after learning that Global was not providing the training it was supposed to. He was replaced as chair by board member Kristal Screven. Screven reportedly also began receiving the same $1,000-a-month payments that Moore had received. Finally, in July 2009, defendant Christopher Martin replaced Screven as Board Chair. Ward then approached Martin and offered him the same deal Moore and Screven had accepted. Martin accepted this offer and was reportedly paid $1,000 every month until December 2009 or January 2010. As an added bonus, Martin approached Ward in July 2009 and asked for him to finance a trip to Las Vegas for a leadership conference hosted by the fraternity of which both men were members. Ward agreed, accompanied Martin to the conference, and paid for Martin's food, airfare, hotel, and a prostitute at the conference.

Meanwhile, payments to Global increased beyond the initial contractual obligations. The board increased monthly payments from $22,000 to $29,000 without explanation. In June 2009, Global stopped providing services to Arise, but continued to collect tens of thousands of dollars each month from the school for another year. The board was told these payments were necessary under a "buyout clause" in the initial contract, although in fact there was no such "buyout clause." All told, Global received $420,919 from Arise. While Global was receiving these payments, Arise teachers saw their salaries cut by a fifth, and staff members were not consistently paid. Arise eventually ran out of money and closed in 2010.

A few years after Arise closed, the $420,919 in payments to Global attracted the attention of the FBI, which was investigating Ohio community schools on another matter. Eventually, the Government signed a proffer agreement with Mike Ward, the "silent partner" at Global. On the basis of Ward's expected testimony, the Government indicted Arise superintendent Shane Floyd, Arise board members Christopher Martin and Kristal Screven, and Global owner Carl Robinson. Charges included federal programs bribery, conspiracy to commit federal programs bribery, and making material false statements. *See* 18 U.S.C. § 666(a)(1)(B), (a)(2); 18 U.S.C. § 371; 18 U.S.C. § 1001(a)(2). Defendant Screven signed a plea agreement, leaving only Robinson, Martin, and Floyd to stand trial.

The jury trial began on Monday, May 18, 2015. The prosecution's case depended heavily on the testimony of the unindicted-conspirator-turned-government-witness Ward, who testified as to the nature of the agreement between himself, Floyd, and Robinson, as well as his efforts to convince the board members Moore, Screven, and Martin to accept bribes in order to make sure Arise was paid promptly. The Government's case also relied heavily on the testimony of FBI Special Agent Jeffrey Rees, who testified as a lay witness under Fed. R. Evid. 701 and explained how he had come to investigate Arise; recounted the bank records he had found showing that Floyd, Robinson, and Ward had apparently split the proceeds from the Arise contract; and read to the jury portions of Martin's rejected proffer agreement in which Martin admitted to receiving payments from Ward in exchange for prompt payments to Global.

Jury deliberations began on Friday, May 29, and continued until Tuesday, June 2. On Monday, June 1, the jury sent the court several questions, the gist of which was whether

Robinson and Floyd could be held accountable for the acts of other parties—notably the unindicted co-conspirator Ward—and how the jury should proceed "if one or more juror members feel like the jury is intentionally being hung?" In response, the court read to the jury the Sixth Circuit pattern instructions for *Pinkerton* liability—i.e., that in a conspiracy, "the act of one conspirator may be treated as the act of all"—as well as a Sixth-Circuit pattern *Allen* charge—i.e., instructions to a potentially deadlocked jury to continue their deliberations and reconsider each other's views in good faith. The same day, the district court also received a note from the jury asking for two demonstrative aids that had been visible to the jury during trial but not admitted into evidence, namely written portions from Martin's failed proffer agreement that Agent Rees read to the jury, as well as a flow-chart showing money movement among the defendants. Over the objections of defense counsel, the court provided these demonstrative aids to the jury during deliberations, but also read an instruction that the aids "[were] not evidence [themselves] and must not be considered as proof of any facts."

The next day, Tuesday, June 2, the jury again notified the court that it felt it would not be able to come to an agreement on the conspiracy count. The court responded with a second pattern *Allen* charge, as well as some additional remarks urging the jurors to reconsider each other's opinions. Several hours later, the jury rendered a verdict finding that all three defendants were guilty on all counts. The jury was polled and all members declared that theirs was the verdict that had been announced. The court then admonished the attorneys for both sides that "I did not inquire of the jurors whether they wanted to speak with counsel, and so I will ask you not to contact them since it was not preapproved."

Three months later, on the morning of Floyd's sentencing hearing, Floyd's attorney filed a motion for a new trial, which the other two defendants later joined. Robinson, Floyd, and Martin are all African-American, and Floyd's counsel alleged that the only two African-American jurors looked uncomfortable during the verdict and polling. He therefore hired a private investigator to interview these two African-American jurors, who are identified in the record as A. R. and M. S. A. R. and M. S. reported that they were initially unconvinced by the evidence of the defendants' guilt. However, instead of discussing these doubts in good faith, the jury foreperson—a white woman—reportedly told A. R. and M. S. that she believed they were

reluctant to convict because they felt they "owed something" to their "black brothers." This remark prompted a confrontation, requiring the marshal and the deputy clerk to intervene in an attempt to calm things down. Floyd argued that this intervention by court personnel constituted improper outside influence, necessitating a new trial.

However, the district court denied Floyd's motion and Robinson's and Martin's derivative motions, in part because the evidence that Floyd relied on was inadmissible under Fed. R. Evid. 606(b), which codifies the longstanding "no-impeachment rule" against using juror testimony to impeach a verdict. The district court therefore proceeded to sentencing. Over objection by Floyd's counsel, the district court found Floyd responsible for an actual loss of $420,919—the entire value of Global's contract with Arise—which enhanced his sentence and increased the amount for which he was liable in restitution.

II.

Floyd, Robinson, and Martin now appeal, seeking reversal of their convictions on six different grounds. First, all three defendants argue that the jury foreperson's racist remarks show that stereotyping or animus affected the jury's verdicts, warranting reversal under the holding of *Pena-Rodriguez v. Colorado*, 137 S. Ct. 855 (2017), a Supreme Court case decided while this appeal was pending. The three defendants also repeat their argument that the marshal and deputy clerk's intervention in response to these remarks constituted improper outside influence on the jury. Second, all three defendants argue that the court's *Allen* charges coerced the dissenting jurors into agreeing with the majority verdict. Third, Robinson argues that FBI Special Agent Rees delivered inappropriate lay opinion testimony that invaded the province of the jury. Fourth, Robinson also argues that providing the jury with Martin's out-of-court confessions violated Robinson's Confrontation Clause rights under *Bruton v. United States*, 391 U.S. 123 (1968), because Martin's confession indirectly incriminated Robinson but Robinson was not able to cross-examine his non-testifying co-defendant. Fifth, Martin argues that the district court inappropriately allowed demonstrative aids that were not admitted into evidence to go back to the jury during deliberations.[2] Sixth, Floyd argues that the district court miscalculated the

---

[2]Robinson incorporates this argument by reference.

amount of loss to the government for sentencing purposes, using the total value of Global's contract with Arise rather than the value of the contract less the value of services actually performed.[3]

A.

First, all three defendants argue that the jury foreperson's remarks violated their Sixth-Amendment right to an impartial jury. While the foreperson's reported remarks were certainly reprehensible, they do not, on the facts of this case, warrant a new trial or an evidentiary hearing.

As noted above, Floyd's counsel hired a private investigator to interview the two African-Americans on the jury, A. R. and M. S. A. R. and M. S. reportedly told the investigator that jury deliberations had become openly hostile along racial lines. Specifically, the ten other jurors had been ready to convict at the beginning of deliberations, but A. R. and M. S. had doubts about the credibility of the unindicted-co-conspirator-turned-government-witness Mike Ward—whom the defense had shown to be an ex-police officer who lost his job due to a drug conviction—and also believed Floyd's account of why he had deposited thousands of dollars in cash into his bank account—i.e., that he was a minister of a church with a tradition of parishioners giving cash gifts, and that these cash gifts had accumulated over time until he deposited them. A. R. and M. S.'s doubts prevented the jury from reaching a consensus for the next three days of deliberations, during which time the jury sent several notes to the court, prompting the *Allen* charges and *Pinkerton* liability instructions.

This disagreement boiled over into confrontation on the last day of deliberations, June 2. The jury foreperson—a white woman—reportedly told A. R. and M. S. that she "[found] it strange that the colored women are the only two that can't see" that the defendants were guilty, and accused A. R. and M. S. of deliberately trying to hang the jury. M. S. reported being so angered by this remark that her "eyes started watering" and she wanted to "smack the shit out of" the foreperson. A verbal confrontation ensued, which required the marshal to enter the jury room to broker peace. After things calmed down, the deputy clerk persuaded the foreperson to apologize to A. R. and M. S. The foreperson did apologize for her remarks, but then said that

---

[3]Martin and Robinson incorporate this argument by reference.

she still felt A. R. and M. S. were protecting the defendants because they felt they "owed something" to their "black brothers." Again, the foreperson's words prompted a confrontation, and, again, the deputy clerk intervened, ultimately persuading A. R. and M. S. to return to deliberations. A few hours later, the jury delivered its unanimous guilty verdict.

During their interviews with Floyd's investigator, A. R. and M. S. expressed anger and frustration with the foreperson's behavior, but nevertheless stood by their ultimate decision to vote to convict. When asked whether the foreperson intended to sway her decision, M. S. reportedly replied, "I don't think so. I just think [the foreperson] was ignorant, yeah. I mean, because at any time despite with all of that they were saying, whatever, I was still going on how I felt and the information that was presented to me and how I perceived it anyway, you know so." Similarly, A. R. said she was initially unsure of the conspiracy charge because she was not confident that there was evidence of an agreement between Floyd, Robinson, and Martin. Nevertheless, she said that she and M. S. examined the evidence together and noticed that Global had been incorporated only three days before the contract was approved, and also that Robinson was at the board meeting where Arise approved the Global contract—two facts that were enough to assuage her doubts about the existence of a conspiracy.

Notwithstanding this evidence of juror impropriety, the district court denied Floyd's motion for a new trial, as well as Robinson's and Martin's derivative motions. The district court gave several reasons for the denial. First, the district court concluded that Floyd's motion was untimely because it was filed several months after the 14-day deadline and was based on evidence that could have been discovered immediately after the trial ended. *See* Fed. R. Crim. P. 33(b); *see also United States v. Calderon*, 127 F.3d 1314, 1351 (11th Cir. 1997). Second, the district court noted that it was "equally disturbed by counsel's knowing disregard for this Court's local rules and his direct violation of the Court's trial order regarding contact with jurors." The court pointed to a local rule in the Southern District of Ohio that "[n]o attorney, party or anyone acting as agent or in concert with them connected with the trial of an action shall personally, or acting through an investigator or other person, contact, interview, examine, or question any juror regarding the verdict or deliberations of the jury in the action except with leave of the Court." *See* Southern District of Ohio Local Civil Rule 47.1; *see also* Southern District of Ohio Local

Criminal Rule 1.2 (applying local civil rules in criminal context in most cases). The court also noted that it had specifically admonished both parties that contact with jurors was not preapproved—an admonishment that Floyd's attorney had blatantly disregarded by contacting A. R. and M. S. The court concluded that these violations alone were enough to exclude A. R. and M. S.'s interviews and dismiss Floyd's motion, and cited several cases where our sister circuits have affirmed district court judgments on these grounds. *See United States v. Ridings*, 569 F. App'x 73, 75 (3d Cir. 2014); *Cuevas v. United States*, 317 F.3d 751, 753 (7th Cir. 2003); *United States v. Venske*, 296 F.3d 1284, 1291 (11th Cir. 2002). Third, the district court held that it could not consider the A. R. and M. S. interviews as evidence under the "no-impeachment rule," Fed. R. Evid. 606(b), which excludes juror testimony about any "statement made or incident that occurred during the jury's deliberations" from being used to impeach the validity of a verdict.

Focusing on the marshal's and deputy clerk's intervention into jury deliberations to defuse confrontation, Floyd initially moved for a new trial or at least a hearing on the basis of the exception in Fed. R. Evid. 606(b)(2)(B) for when "outside influence was improperly brought to bear on any juror." However, while this appeal was pending, the Supreme Court held in *Pena-Rodriguez* that the traditional "no-impeachment rule" codified in Fed. R. Evid. 606(b) may violate the Sixth Amendment right to an impartial jury when "a juror makes a clear statement that indicates he or she relied on racial stereotypes or animus to convict a criminal defendant." 137 S. Ct. at 869. In such cases, a court may decline to apply the no-impeachment rule, consider juror testimony, overturn a jury verdict, and hold a new trial. *See id.* Accordingly, the defendants now argue that the foreperson's remarks show that animus influenced both the foreperson's own vote and—through the foreperson's inappropriate pressure—the votes of A. R. and M. S. as well, triggering *Pena-Rodriguez*. Defendants further argue that the district court's reasoning would have been different had *Pena-Rodriguez* been decided at the time, because the district court specifically relied on the no-impeachment rule that *Pena-Rodriguez* held could be unconstitutional in circumstances such as these. Therefore, argue the defendants, their convictions should be reversed and the case remanded.

However, defendants' argument is unpersuasive.  First, unlike in *Pena-Rodriguez,* the district court here denied the motion because it was based on evidence gathered in violation of both a local court rule and a specific admonishment from the bench not to contact jurors.  The court noted that these violations were enough on their own to deny Floyd's motion, citing several cases from other circuits to that effect.  *See Ridings*, 569 F. App'x at 75; *Cuevas*, 317 F.3d at 753; *Venske*, 296 F.3d at 1291.  *Pena-Rodriguez* itself suggests that local rules and orders limiting jury contact can be enforced:

> The practical mechanics of acquiring and presenting such evidence [of juror animus] will no doubt be shaped and guided by state rules of professional ethics and local court rules, both of which often limit counsel's post-trial contact with jurors.  These limits seek to provide jurors some protection when they return to their daily affairs after the verdict has been entered.

137 S. Ct. at 869 (citations omitted).  This reasoning strikes a balance by curtailing the no-impeachment rule when it violates the Sixth Amendment, but also reaffirming the rules governing post-verdict juror contact.  In other words, even though defense counsel should, in some circumstances, be able to interview jurors in order to impeach verdicts based on stereotyping and animus, jurors are still entitled to "protection when they return to their daily affairs after the verdict has been entered," *id.*, and the district court must be able to oversee post-verdict juror contact.

In direct contrast to the instant case, the defense counsel in *Pena-Rodriguez* did follow all the rules.  It was the jurors in *Pena-Rodriguez* who approached defense counsel after the verdict and reported that another juror had made remarks during deliberations suggesting animus; the defense counsel then "reported this to the court and, with the court's supervision, obtained sworn affidavits from the two jurors."  *Id.* at 861.  Therefore, given *Pena-Rodriguez*'s reaffirmation of the validity of such local rules, it was not an abuse of discretion for the district court to deny Floyd's motion on the basis of his counsel's violation of these rules.  Furthermore, given the district court's suggestion that these violations were enough on their own to deny Floyd's motion, there is no reason to believe there would have been a different result had the court anticipated *Pena-Rodriguez.*

Second, the stated holding of *Pena-Rodriguez* would not apply even if the defendants had not violated a local court rule and their evidence was properly before the district court. *Pena-Rodriguez* makes clear that it does not apply to a mere "offhand comment indicating racial bias or hostility," but only to a "clear statement" that "tend[s] to show that racial animus was a significant motivating factor *in the juror's vote to convict*." *Id.* at 869 (emphasis added). Here, the foreperson's reported comments clearly "indicat[ed] racial bias or hostility." *Id.* She told A. R. and M. S. that she "[found] it strange that the colored women are the only two that can't see" and that she thought they were protecting the defendants because they felt they "owed something" to their "black brothers." However, the foreperson did not make comments—much less a "clear statement"—showing that animus was a "significant motivating factor" in her own vote to convict. She never suggested that she voted to convict Robinson, Martin, and Floyd because they were African-American. While she did impugn A. R. and M. S.'s integrity based on their shared race with the defendants, she never said anything stereotyping the defendants based on their race.

The juror's racist remarks in *Pena-Rodriguez* were very different. In that case, a Mexican-American was charged with sexually assaulting two teenage sisters in the bathroom of a Colorado horse-racing facility. *Id.* at 861. During jury deliberations, one juror reportedly told the others that "I think [the defendant] did it because he's Mexican and Mexican men take whatever they want," that "Mexican men had a bravado that caused them to believe they could do whatever they wanted with women," and that "nine times out of ten Mexican men were guilty of being aggressive toward women and young girls." *Id.* at 862. These remarks clearly demonstrated the juror's animus against Mexicans and, crucially, the juror's reliance on this bias in voting to convict. In contrast, none of the foreperson's remarks here come close to the *Pena-Rodriguez* juror's level of stereotyping or animus, and the foreperson's remarks were not directed against Robinson, Martin, or Floyd in the same way that the *Pena-Rodriguez* juror's remarks were directed against the defendant in that case.

Defendants counter that even if the foreperson's remarks did not show that the foreperson's animus affected the foreperson's vote, the remarks might still show that the foreperson's animus indirectly influenced A. R.'s and M. S.'s votes, such that there would still

be a violation of *Pena-Rodriguez* and the Sixth Amendment.  However, the facts of this case belie this theory.  M. S. later reported that, despite the foreperson's remarks, she stood by her vote to convict, because "I was still going on how I felt and the information that was presented to me and how I perceived it anyway."  Similarly, A. R. reported that she decided to convict after she and M. S. examined documents showing that Global had been incorporated only three days before the contract with Arise was approved, and also that Robinson had been present at the meeting where that approval took place.  Therefore, based on the information available, the foreperson's animus appeared not to have influenced A. R.'s or M. S.'s vote.  *Pena-Rodriguez* does not overcome the no-impeachment rule here.

Finally, repeating their initial argument before the district court, defendants contend that the marshal and deputy clerk's interventions constituted unauthorized contacts with the jury, necessitating a hearing under *Remmer v. United States*, 347 U.S. 227 (1954).  The defendants contend that these contacts—whatever their intention—had the effect of forcing A. R. and M. S. back into the jury room, "add[ing] pressure on the jurors to change their minds and reach a guilty verdict."  This, the defendants argue, is enough to trigger a *Remmer* hearing, where the district court must investigate whether private contact had a prejudicial effect on the verdict.  *See Remmer*, 347 U.S. at 229–30 (1954); *see also United States v. Pennell*, 737 F.2d 521, 533 (6th Cir. 1984); *United States v. Rigsby*, 45 F.3d 120, 124-25 (6th Cir. 1995).  Even without *Pena-Rodriguez*, Fed. R. Evid. 606(b) permits juror testimony when "outside influence was improperly brought to bear on any juror."

This argument is also unpersuasive.  First, like the evidence of juror misconduct, the evidence of alleged improper influence on the jurors was gathered in violation of a local rule and the court's specific instructions that contacts were not preapproved.  Therefore, the district court was within its discretion to exclude such evidence and deny the defendants' motion on these grounds as well.  *See, e.g., Venske*, 296 F.3d at 1291.  Second, as the district court correctly noted, *Remmer* is only half the story.  It is the law that a district court should generally respond to evidence of external tampering with a *Remmer* hearing.  *See Remmer*, 347 U.S. at 229–30.  However, it is also the law that "not all communications with jurors warrant a hearing for a determination of potential bias" and "an allegation of an unauthorized communication with a

juror requires a *Remmer* hearing only when the alleged contact presents a likelihood of affecting the verdict." *United States v. Frost*, 125 F.3d 346, 377 (6th Cir. 1997). Here, the evidence was weak that the unauthorized contact affected the verdict—all the marshal and deputy clerk did was prevent a fight among the jurors, coax the foreperson into apologizing to A. R. and M. S., and then convince A. R. and M. S. to return to deliberations. It was therefore not an abuse of discretion to deny Floyd's motion for a new trial on these grounds, and this court can overturn an evidentiary ruling only when there has been an abuse of discretion, *United States v. Herndon*, 156 F.3d 629, 634 (6th Cir. 1998).

B.

Second, all three defendants take issue with the district court's use of *Allen* charges—instructions to a potentially deadlocked jury to continue their deliberations and reconsider each other's views in good faith. The defendants argue that the court's use of *Allen* charges in this case coerced the jury into rendering a guilty verdict, in violation of the Sixth-Amendment "right of a defendant to rely on the possibility of disagreement by the jury." *United States v. Harris*, 391 F.2d 348, 355 (6th Cir. 1968). However, the district court's actions are not enough for reversal here, either.

As noted above, over the course of its three days of deliberations, the jury sent the court several notes suggesting that it was having trouble reaching a consensus. At 11:30 a.m. on Monday, June 1, the second day of deliberations, the jury sent the court a note asking: "if we cannot agree on Count One of conspiracy, can we rule on the other counts?" In response, the court instructed the jury:

> Yes, you may. It is easier in some respects, because there is a certain logic in taking up the issues in the order in which I read them to you in my instructions, but I will not tell you the order in which you have to take up consideration of these issues. I would encourage you to resolve the conspiracy issue because ultimately all of these issues have to be resolved.

Defense counsel did not object. At about 2:00 p.m. the same day, the jury sent the court another note, asking: "How are we to proceed if one or more juror members feel like the jury is intentionally being hung?" In response, the court read the jury a full *Allen* charge from the Sixth Circuit Pattern Jury Instruction. Counsel objected to this first *Allen* charge. Immediately after

the *Allen* charge was read, the jury asked to be released at 5:00 p.m.  The judge granted the jury's request, but added: "I want to be clear that I expect you to continue your deliberations toward a unanimous verdict."  Counsel did not object to this statement.  Finally, at about 10:00 a.m. on Tuesday, June 2, the final day of deliberations, the jury sent the court another note stating: "We, the jury, feel that we will not be able to come to agreement on Verdict Form 1 and 2 on Count One [i.e., the conspiracy count]."  The court responded with a second full *Allen* charge following the Sixth Circuit pattern instruction.  After this second *Allen* charge, the district court added:

> As important as it is for you to reach unanimous agreement, it is just as important that you do so honestly and in good conscience.  What I have just said to you is not meant to rush or to pressure you into agreeing on a verdict.  Take as much time as you need to discuss things.  There is no hurry.  But I can't emphasize enough, ladies and gentlemen, how important it is for you to listen to one another both respectfully and carefully and to weigh the evidence and hear what your fellow jurors have to say. . . . Read the instructions, consider all of the instructions in context, and listen to each other as you deliberate, because everyone is trying to do justice here and people have legitimate disagreements. But as mature adults, every one of you has had a disagreement with someone and has been able to work through it at some point in your lives.

Counsel did not object to either the second *Allen* charge or the court's additional comments.  The jury then returned to deliberations, and, at about 2:45 p.m., returned a verdict finding all three defendants guilty on all counts.

Neither the court's multiple *Allen* charges nor any of the specific language in the *Allen* charges warrants reversal.  First, the two full *Allen* charges and other *Allen*-charge-like statements do not warrant reversal.  Multiple *Allen* charges are not per se coercive.  *See United States v. Barone*, 114 F.3d 1284, 1305 (1st Cir. 1997); *United States v. Reed*, 686 F.2d 651, 653 (8th Cir. 1982); *United States v. Fossler*, 597 F.2d 478, 483-85 (5th Cir. 1979); *United States v. Robinson*, 560 F.2d 507, 517–18 (2d Cir. 1977) (en banc).  *But see United States v. Seawell*, 550 F.2d 1159, 1163 (9th Cir. 1977).  Instead, each case must be evaluated under the totality of the circumstances.  *United States v. Reed*, 167 F.3d 984, 990 (6th Cir. 1999).  Here, several factors mitigated any coercion from the multiple charges.  The trial was lengthy and complex, such that additional jury instruction may have been necessary.  The first *Allen* charge was in response to the jury's question about how to proceed in the face of disagreement; only the second

was in response to the jury's report that it was deadlocked.  The two full *Allen* charges followed the Sixth Circuit pattern jury instructions, *see* Sixth Circuit Pattern Criminal Jury Instruction 9.04, which have been held to be non-coercive, *see Clinton*, 338 F.3d at 489–90.  Even outside of the pattern language, the court emphasized dissenting jurors' freedom to disagree, explaining after the second charge, for example, that:  "What I have just said to you is not meant to rush or to pressure you into agreeing on a verdict."  Although defense counsel objected to the first *Allen* charge, there were no objections to any of the other remarks defendants now take issue with, such that the multiplicity of the charges must be reviewed for plain error, *see Clinton*, 338 F.3d at 487.  Given the mitigating factors in this case, there was no plain error.

Second, the district court's specific language does not warrant reversal, either.  Defendants take issue with the court's remark that "I would encourage you to resolve the conspiracy issue because ultimately all of these issues have to be resolved."  This language does bear a resemblance to instructions this court has deemed "coercive" in the past, notably:

> [T]his lawsuit must be decided—it must be decided at some time by some jury, which just means that if you are unable to decide this lawsuit that we're going to have to declare a mistrial in this case and we will have to then call in twelve more jurors and try this case over again.

*Harris*, 391 F.2d at 351, 354.  However, context distinguishes the remarks in *Harris* from the remarks at issue in this case.  To begin with, the court's remarks in *Harris* were in response to the jury foreperson's statement that "we feel at this time that we are deadlocked."  In contrast, here the court's remarks were in response to the jury's question "if we cannot agree on Count One of conspiracy, can we rule on the other counts?"  The district court appears to have reasonably interpreted this as a question about the order in which the issues should be resolved and explained to the jurors: "It is easier in some respects, because there is a certain logic in taking up the issues in the order in which I read them to you in my instructions, but I will not tell you the order in which you have to take up consideration of these issues."  The difference in the questions that prompted the *Allen*-charge-like remark distinguishes this case from *Harris*.  Furthermore, the court in this case said nothing analogous to the *Harris* district court's clearly coercive statement that "if you are unable to decide this lawsuit [then] we're going to have to declare a mistrial in this case and we will have to then call in twelve more jurors and try this case

over again"—a remark that the *Harris* court deemed not only "coercive" but "misleading in fact" because it "preclude[d] the right of a defendant to rely on the possibility of disagreement by the jury." *Id.* at 355. Here, in contrast, the district court's remark was followed by two pattern *Allen* charges emphasizing dissenting jurors' freedom to continue to dissent, curing any coercive effect. Finally, there were no objections to the remark by the district court that "ultimately all of these issues have to be resolved," such that this remark must be reviewed for plain error, *see Clinton*, 338 F.3d at 487. Given the differences in context between the remarks in *Harris* and the remarks here, there was no plain error.

Defendants also take issue with the court's remark to the jurors that "as mature adults, every one of you has had a disagreement with someone and has been able to work through it at some point in your lives." This remark was not coercive either. In context, it can reasonably be interpreted as a plea for civility and respect, and not as pressure on dissenting jurors to agree with the majority. There was no plain error here.

## C.

Third, Robinson argues that FBI Special Agent Jeffrey Rees gave lay opinion testimony that inappropriately invaded the province of the jury. Robinson contends that Agent Rees's use of the words "significant," "notable," and "suspicious," to describe certain bank transactions crossed the line from Rees's permissibly presenting conclusions to the jury based on his own personal knowledge or observation, *see United States v. Kilpatrick*, 798 F.3d 365, 379 (6th Cir. 2015), into Rees's impermissibly drawing conclusions that the jury was competent to draw on its own, *see United States v. Freeman*, 730 F.3d 590, 597 (6th Cir. 2013). Robinson also takes issue with Rees's characterization of some payments from Robinson to Floyd as "kickbacks," which Robinson contends is the same as the "egregious spoon-feeding of the government's theory of the case to the jury" that this court has criticized in the past. *See United States v. Williamson*, 656 F. App'x 175, 187–88 (6th Cir. 2016).

As noted above, Agent Rees testified as a lay witness under Fed. R. Evid. 701 and explained to the jury how he had come to investigate Arise based on bank records he had uncovered. During the course of this testimony, Rees used the words "significant," "notable,"

and "suspicious" to describe certain transactions.  For example, when eliciting why Rees decided to investigate Global, the prosecutor asked: "You said you noticed some suspicious transactions or things that were suspicious. What do you mean by that?"  Rees responded:

> Well, the first thing that caught my attention was the amount of money that Global was paid. They were paid a significant amount of money. It turned out to be over $400,000. Looking at individual's bank records, I saw suspicious transactions in there as well, things involving cash, large cash withdrawals, some suspicious cash deposits.

Defense counsel did not object at the time.  Later, the prosecutor asked: "And did you notice any notable transactions in Shane Floyd's bank account?"  Rees answered: "[I] [p]articularly noticed there were some significant cash deposits by Shane Floyd."  Defense counsel objected to the word "significant"—an objection that the court sustained, asking the prosecutor to clarify what was meant by the word.  The prosecutor rephrased the question: "Were there any transactions that you noticed in Shane Floyd's bank document records that were notable for the purposes of your investigation?"  Rees and the prosecutor both used the term "significant" several more times during Rees's testimony, although defense counsel did not object.  For example, in one exchange, the prosecutor asked Rees: "Can you describe to the jury what this e-mail is and why it was significant?"  Rees answered that it was an e-mail between Arise's treasurer and Floyd and that "[i]t was significant because it was forwarding a request for payment, a very significant payment of $66,000 in July."  Defense counsel again did not object.

Rees also described some of the payments between Robinson, Floyd, and Martin as "kickbacks."  During questioning about cash withdrawals from Global's account, the prosecutor asked: "You indicated these cash withdrawals were significant to your investigation. Why is that?"  Rees responded: "It's significant because if you're going to withdraw cash from the payments, it's hard to trace where that cash is going. So it would be certainly easier to pay a kickback payment in cash than it would be in check."  Defense counsel did not object.  Similarly, during cross-examination, defense counsel sought to show that Arise's buy-out of Global's contract was legitimate and asked: "Nothing criminal about it [i.e., the buyout]?"  Rees responded:  "That's not true. . . . They were not entitled to that money.  And they got kickbacks to give them that money."

None of these remarks warrant reversal. First, a close reading of Rees's testimony shows that his purpose for using the terms "significant," "notable," and "suspicious" was to explain to the jury why he launched the investigation into Global in the first place, not to tell the jury what conclusions to draw from this investigation. For example, the one time that defense counsel objected to the use of these words, the prosecution rephrased the question as "[w]ere there any transactions . . . that were *notable for the purposes of your investigation*?" Similarly, the prosecution later asked, "You indicated these cash withdrawals were *significant to your investigation*. Why is that?" In this context, Rees can be understood as explaining to the jury *why* he took the actions he did in investigating Global, rather than as drawing for the jury the conclusion that these transactions were significant or notable for the Government's case-in-chief. Thus, Rees's testimony falls within the category of personal-experience testimony that Fed. R. Evid. 701 permits, rather than impermissible spoon-feeding of the Government's theory of the case. This conclusion is further cemented by the standard of review. Defense counsel objected to one use of the terms "notable" and "significant," which triggers abuse-of-discretion review for that one statement, *Kilpatrick*, 798 F.3d at 378. All other statements were not objected to, triggering only plain-error review. *See id.* Under a reasonable reading of Rees's testimony in context, Robinson can overcome neither of these deferential standards.

Second, Rees's use of the word "kickback" was not "egregious spoon-feeding of the government's theory of the case to the jury." Rees's first use of the word "kickback" was in response to the prosecution's question: "[y]ou indicated these cash withdrawals were significant *to your investigation*. Why is that?" Therefore, again, context shows that Rees was explaining why he was investigating—because the transactions he saw were consistent with a kickback scheme—rather than telling the jury what to conclude. This is not enough for a retrial, especially since defense counsel did not object to this remark, triggering plain-error review. *See id.* Furthermore, Rees's second use of the word "kickback" was in response to the defense's question on cross-examination: "Nothing criminal about it [i.e., the buyout]?" to which Rees responded, "[t]hat's not true. . . . They were not entitled to that money. And they got kickbacks to give them that money." In this context, Rees's use of the word "kickbacks" was merely an isolated answer to a leading question by defense counsel on cross-examination. Given that there

was no objection to this remark either, this remark is reviewed for plain error, and there was no plain error here.

Finally, Robinson also complains that the district court failed to demarcate Rees's factual testimony from his opinion testimony. Such a failure can constitute error in some cases. *See United States v. Rios*, 830 F.3d 403, 416 (6th Cir. 2016); *United States v. Lopez-Medina*, 461 F.3d 724, 744 (6th Cir. 2006). However, this last argument also fails. Following Sixth Circuit pattern jury instructions, the district court made clear to the jury that "[y]ou've heard the testimony of Jeffrey Rees . . . who testified to both facts and opinions. Each of these types of testimony should be given the proper weight." With regard to testimony on facts, the district court instructed the jury to "consider the factors discussed in these instructions for weighing the credibility of witnesses." With regard to testimony on opinions, the district court instructed the jury that "you do not have to accept the opinions of Jeffrey Rees" and that "[i]n deciding how much weight to give [Rees's opinions], you should consider the witness's qualifications and how he reached his conclusions, along with other factors discussed in these instructions for weighing the credibility of witnesses." Defense counsel did not object to these instructions at the time, and so this court again must review for plain error. *Kilpatrick*, 798 F.3d at 378. It cannot have been plainly erroneous for the district court to provide the Sixth Circuit pattern jury instructions to cure any confusion about whether Rees was testifying as to facts or opinions.

D.

Fourth, Robinson also argues that presenting the jury with out-of-court statements from his non-testifying co-defendant Christopher Martin's failed proffer agreement violated the Confrontation Clause and *Bruton v. United States*, 391 U.S. 123 (1968). Even though the district court redacted Robinson's name from these out-of-court statements and provided the Sixth Circuit pattern *Bruton* jury instructions, Robinson argues that the conspiracy charge against Robinson connected him with unindicted co-conspirator Mike Ward, whose name was not redacted from Martin's out-of-court statements. Therefore, contends Robinson, Martin's out-of-court confessions inculpated Robinson indirectly through his connection to Ward, and, because he could not cross-examine Martin, their admission violated *Bruton* and the Confrontation Clause.

It is true that Martin's out-of-court confessions did clearly incriminate Ward. For example, in one such statement read to the jury, Martin confessed that:

> Mike Ward continued to press me about how much it would take to become a full-time board chair. . . . I eventually suggested to Mike Ward that I thought about $1,000 per month would help me tremendously in becoming a full-time board chair.

Neither Robinson's nor Floyd's attorney objected to this statement. In another statement read to the jury, Martin confessed that:

> Mike Ward had told me it would be okay, that Brian Moore and Kristal Allen [née Screven] had done it too, and that it was okay for me to do it too. . . . Mike Ward was like others had done it, so you can do it too, Chris.

Again, neither Robinson's nor Floyd's attorney objected to this statement at the time. In a final statement read to the jury, Martin confessed that:

> It was around October to November of 2009 that I accepted another cash payment from Mike Ward. . . . I knew I should not have accepted it, but I was thinking if I have to put up with this bullshit at the school, then I will take some compensation for it. It was wrong and I know now that I should not have done it.

There were no objections. These statements were not admitted into evidence, but they were displayed to the jury as Rees was reading them aloud.

Furthermore, Agent Rees also recounted additional out-of-court statements by Martin that suggested a connection between Ward and Robinson. For example, in one line of questioning, the prosecutor elicited testimony from Rees on inconsistencies between his first and second interviews with Martin. According to Rees, during his first interview with Martin, Martin had said that he "did not receive any cash or anything of value from either *Carl Robinson or Mike Ward*." However, Rees then said that "statements in [Martin's second] interview conflict[ed] with statements in the first," because Martin said during his second interview that "*Mr. Ward* had given him things of value including cash and a trip to Las Vegas that had expenses paid in it." Rees further explained, "[a]nd that conflicted with his statement previous [sic] when he said he had received no cash or things of value from *Mr. Ward or Mr. Robinson*." Defense counsel did not object to these statements at the time. Last of all, in closing arguments, the prosecution emphasized that "Carl Robinson, through his silent partner and minion, Mike Ward, . . . provided

cash, benefits and kickbacks to the shot callers Floyd and Martin." Robinson now argues this connected him with Ward, whose name was not redacted from Martin's out-of-court confession.

It is possible that the conspiracy charge may have linked Robinson with his unindicted co-conspirator Ward in the mind of the jurors. As Robinson points out, the jury asked several questions connecting Robinson to Ward on the basis of the conspiracy theory, which may have allowed them to connect Robinson to Martin's statements incriminating Ward. Notably, during deliberations the jury asked the court, "[a]re we supposed to assume that Robinson, Ward and Global are the same people when it comes to money being given?" and "[d]o we hold Robinson accountable for Ward when it comes to money transactions?" In response, the court read to the jury the Sixth Circuit pattern instruction on *Pinkerton* liability, which provides that "under certain circumstances, the act of one conspirator may be treated as the act of all."

Nevertheless, there was no *Bruton* violation here. By eliminating any mention of Robinson's name from the Martin out-of-court statements—and providing the Sixth Circuit pattern jury instructions—the district court complied with *Richardson v. Marsh*, a post-*Bruton* Supreme Court case that permits a co-defendant's confession to be used at a joint trial so long as the confession is "redacted to eliminate not only the defendant's name, but any reference to his or her existence." 481 U.S. 200, 211 (1987). These proper redactions can cure even "confessions incriminating by connection," i.e., statements that do not incriminate a co-defendant on their own, but become incriminating "when linked with evidence introduced later at trial." *Id.* at 208-09. Here, even if the conspiracy charge connected Robinson to Ward, Martin's out-of-court confessions contained no mention of Robinson's name or even existence, such that they could only be "incriminating by connection . . . when linked with evidence introduced later at trial" and thus not a *Bruton* violation. The Court in *Richardson* justified this rule as a "reasonable practical accommodation between the interests of the state and the defendant in the criminal justice process," *id.* at 211, because to hold otherwise "would impair both the efficiency and the fairness of the criminal justice system to require, in all these cases of joint crimes where incriminating statements exist, that prosecutors bring separate proceedings," *id.* at 210. This same reasoning applies to this case, because to hold that Martin and Robinson must be tried separately merely because Martin's out-of-court confessions mentioned an unindicted co-

conspirator of Robinson's would necessitate separate trials in many conspiracy cases. This reasoning from *Richardson* confirms that there was not a *Bruton* violation.**[4]**

The Eleventh Circuit's holding in *United States v. Schwartz*, 541 F.3d 1331 (11th Cir. 2008), is distinguishable. In that case, the co-defendant's testimony did not directly state that the defendant had committed bad acts, but did state that a company controlled by the defendant had committed bad acts. *Id.* at 1344–46. The Eleventh Circuit held that the use of the company name was "not incriminating on its face" but nevertheless became incriminating when linked with other evidence at trial, namely evidence that the defendant owned and controlled the company. *Id.* at 1351–52. The Eleventh Circuit's reasoning in that case relied on another post-*Bruton* case, *Gray v. Maryland*, which held that a redacted out-of-court statement must truly eliminate any reference to a defendant's existence; for example, the defendant's name may not be "obvious[ly] delet[ed]," i.e., replaced with an ellipses or a symbol from which the jury may still easily infer the defendant's participation. 523 U.S. 185, 192–95 (1998). The Eleventh Circuit likened the use of the name of a company owned by the defendant to such a blank space or obvious deletion. *Schwartz*, 541 F.3d at 1352. Robinson's case is distinguishable from *Gray*, and therefore *Schwartz*, because Martin's out-of-court confessions contained no such indirect reference to Robinson's existence, which makes this case more like the redaction of any reference to the defendant's existence in *Richardson*. *See Richardson*, 481 U.S. at 208.

Finally, Robinson argues that Martin's out-of-court confession violated *Bruton* in still another way, by mentioning Robinson obliquely in passing. Rees testified that Martin had said during his first interview that he "did not receive any cash or anything of value from either *Carl Robinson or Mike Ward*." Rees then testified that "statements in [Martin's second] interview conflict[ed] with statements in the first" because Martin said during his second interview that "*Mr. Ward* had given him things of value including cash and a trip to Las Vegas that had

---

**[4]**There is disagreement as to the proper standard of review here. Robinson joined Floyd's motion to sever his trial from Martin's, but did not object to any of the statements that he now argues implicate the Confrontation Clause. This circuit has not decided whether a motion to sever counts as an objection that preserves a Confrontation Clause issue, *see United States v. Ford*, 761 F.3d 641, 654 (6th Cir. 2014), and the other circuits are split on the issue, *compare United States v. Nash*, 482 F.3d 1209, 1218 n.7 (10th Cir. 2007), *with United States v. Jobe*, 101 F.3d 1046, 1068 (5th Cir. 1996). Therefore, it is unclear whether Robinson's Confrontation Clause argument is reviewed *de novo* or for plain error. However, we need not decide the issue in this case, because there was no error at all.

expenses paid in it."  Rees then clarified: "[a]nd that conflicted with his statement previous [sic] when he said he had received no cash or things of value from *Mr. Ward or Mr. Robinson.*" However, these statements also do not violate the Confrontation Clause because they do not incriminate Robinson at all.  Context shows that Ward first told Rees that he did not receive anything of value from either *Robinson or Ward*, but then changed his story and said he received something of value from *only Ward*.  Although Martin's reference to Robinson in his original statement is somewhat confusing, Rees's account of Martin's answer clears up any confusion and incriminates only Ward.  Therefore, the district court did not err in permitting Rees to recount this testimony by Martin.

E.

Fifth, Martin argues that the district court abused its discretion when it sent demonstrative aids to the jury during deliberations.  Robinson incorporates Martin's argument by reference under Fed. R. App. P. 28(I).

As noted above, on the second day of deliberations, the jury sent the district court a note asking for two demonstrative aids: "Chris Martin's bullet points from the FBI" and "the red, slash, gray flow chart that shows money movement."  These aids had been displayed to the jury during Rees's testimony but had not been admitted into evidence.  Over defense counsel's objection, the district court sent these aids to the jury, but also read a pattern jury instruction stating that "[the demonstrative aids] were offered to assist in the presentation and understanding of the evidence" and "[were] not evidence [themselves] and must not be considered as proof of any facts."

This argument is not enough for a new trial.  The law is unclear as to whether it is within a district court's discretion to provide a deliberating jury with demonstrative aids that have not been admitted into evidence.  *Compare United States v. Fults*, 639 F. App'x 366, 370 (6th Cir. 2016) and *United States v. Munar*, 419 F. App'x 600, 608 (6th Cir. 2011) *with Trebmal Constr., Inc. v. Dover Elevator Co.*, No. 89-4126, 1991 WL 165659, at *2 (6th Cir. Aug. 29, 1991).[5]

---

[5]The Government cites several cases for the proposition that demonstrative aids can go to the jury during deliberation.  However, most of the Government's cases are inapposite.  Three of the Government's cases consider

However, we need not resolve this legal issue for this case, because any error from providing the jury with the demonstrative aids was harmless. The Government proved its case against Martin in numerous other ways, including Rees's testimony about his interviews with Martin and Rees's reading of Martin's pre-proffer confessions in open court. Furthermore, the aids were not particularly objectionable in themselves. The bullet points were the written form of verbal evidence read in open court. The flow chart was a simple visual representation of the prosecution's main argument that Global paid Floyd and Martin at Arise to retain business. In other words, both demonstrative aids were based on evidence that the jury was otherwise allowed to see or hear. Finally, the demonstrative aids were provided to the jury during deliberations with a limiting instruction that they "were not admitted into evidence," were "not evidence itself," and "must not be considered as proof of any facts." For all these reasons, any error did not affect Martin's or Robinson's substantial rights, and was therefore harmless under Fed. R. Crim. P. 52(a).

F.

Last of all, Floyd argues that the district court incorrectly calculated the loss to the government. Robinson and Martin again incorporate Floyd's argument by reference under Fed. R. App. P. 28(I). The district court adopted the presentence report's finding of $420,919 in actual loss, which represented the entire amount paid by Arise to Global over the contract's life. In accordance with the instructions at § 2C1.1 of the 2014 Sentencing Guidelines under which Floyd was sentenced, this amount of actual loss produced an additional 14 points for his sentence under the table at § 2B1.1(b). Furthermore, this amount served as the amount for which Floyd is jointly and severally liable in restitution. Floyd now argues that this amount should be offset, in accordance with Application Note 3 to § 2C1.1, by the value of the legitimate services that

---

the separate issue of whether demonstrative aids may be admitted into evidence, which is not the same issue as whether non-admitted demonstrative exhibits may be provided to the jury during deliberations. *See United States v. Bray*, 139 F.3d 1104, 1111–12 (6th Cir. 1998); *Gomez v. Great Lakes Steel Div., Nat'l Steel Corp*, 803 F.2d 250, 257–58 (6th Cir. 1986); *United States v. Pinto*, 850 F.2d 927, 935–36 (2d Cir. 1988). Four more of the Government's cases consider whether demonstrative aids that have been admitted under Fed. R. Evid. 1006 can be provided to the jury during deliberations, which is also not the same issue as whether non-admitted demonstrative exhibits may be provided to the jury during deliberations. *See United States v. Natale*, 719 F.3d 719, 744 (7th Cir. 2013); *United States v. Paulino*, 935 F.2d 739, 753 (6th Cir. 1991); *United States v. Scales*, 594 F.2d 558, 561 (6th Cir. 1979); *United States v. Gazie*, No. 83-1851, 1986 WL 16498, *7-8 (6th Cir. Feb. 26, 1986). Therefore, none of these cases present the issue before us.

Global provided to Arise, and asks for a remand to the district court to carry out this calculation. *See United States v. Lianidis*, 599 F.3d 273, 279 (3d Cir. 2010); *United States v. Quinn*, 359 F.3d 666, 679–80 (4th Cir. 2004); *United States v. Sapoznik*, 161 F.3d 1117, 1119 (7th Cir. 1998).

There was some evidence at trial that Global provided legitimate services to Arise. A former principal of Arise testified that Robinson provided two professional development training seminars during the 2009-2010 school year. An Arise teacher corroborated this account, testifying that she recalled one professional development training course seminar by Robinson, as well as one town hall meeting during which Robinson made a PowerPoint presentation. Ward also testified that his official responsibilities included recruitment and that he recruited between seventy and one hundred students for the 2008-2009 school year, unlocking additional federal funding for Arise. Finally, Arise employed two administrators, who testified that they helped proctor tests, keep track of attendance, assess students for a virtual learning program, and put together training manuals and research materials. Each was paid $4,000 a month.

Nevertheless, Floyd's argument fails for two interrelated reasons. First, Floyd's is not the only interpretation supported by the facts of the case. There may be evidence that Global provided some valuable services, but there is also evidence that the entire Global contract was a sham: Floyd, Robinson, and Ward devised their scheme even before the Global-Arise contract was signed, and Robinson incorporated Global specifically in order to perpetuate the scheme. The entire value paid to a contractor is an appropriate amount for calculating loss when the entire contract was a sham. *See United States v. Washington*, 715 F.3d 975, 985 (6th Cir. 2013); *United States v. Rowland*, 826 F.3d 100, 116 (2d Cir. 2016). Second, Floyd did not raise this argument below. None of Floyd's objections before the district court suggested that actual loss should be reduced by services rendered. In fact, before the district court, Floyd's counsel objected to the $420,919 in actual loss on the grounds that "[t]his man cannot be held liable for the acts of someone else," and suggested a loss amount closer to $169,000. This is an argument for reduction based on apportionment among the co-conspirators, which is different from the legitimate-value-of-services argument Floyd makes now. This court reviews arguments that are raised for the first time on appeal for plain error. *United States v. Mayberry*, 540 F.3d 506, 512 (6th Cir. 2008). Given the evidence that the entire Global contract may have been a sham, it was

not plain error for the district court to use the entire value of the Global contract as the actual loss.

III.

For the reasons set forth above, the judgments of the district court are affirmed with respect to all three defendants.

---

## CONCURRING IN PART AND DISSENTING IN PART

---

BERNICE B. DONALD, Circuit Judge, concurring in part, dissenting in part.  The Sixth Amendment guarantees provide an indispensable constitutional safeguard not only of the rights of the accused, but of society's interest in a just outcome of judicial proceedings.  "One touchstone of a fair trial is an impartial trier of fact—'a jury capable and willing to decide the case solely on the evidence before it.'" *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 554 (1984) (quoting *Smith v. Phillips*, 455 U.S. 209, 217 (1982)).  In its unique role as a group of private citizens called upon to determine guilt or innocence in a criminal trial, "[t]he jury exercises the power of the court and of the government that confers the court's jurisdiction." *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 624 (1991); *see also Shelley v. Kraemer*, 334 U.S. 1, 18 (1948) (state courts and judicial officials reached by Fourteenth Amendment).

Among the most crucial requirements for fairness in judicial proceedings is that racial bias not infect a jury's deliberations and decisions.  This ideal has been historically difficult to attain; as one of our most compelling literary depictions of the criminal justice system put it, "[t]he one place where a man ought to get a square deal is in a courtroom, be he any color of the rainbow, but people have a way of carrying their resentments right into a jury box."[1]  The Supreme Court has held that racial discrimination, "odious in all aspects, is especially pernicious in the administration of justice," *Rose v. Mitchell*, 443 U.S. 545, 555 (1979), and that to allow it in the jury system harms "both the fact and the perception" of the jury's role as "a vital check against the wrongful exercise of power by the State," *Powers v. Ohio*, 499 U.S. 400, 411 (1991); *see also Aldridge v. United States*, 283 U.S. 308, 315 (1931) (public suspicion of bias among jurors harmful to the legitimacy of the courts).

Even a slight suspicion that racial bias corrupted the outcome of a trial may be sufficient to undermine many decades of arduous, patient labor to eliminate the shameful prevalence of

---

[1]Harper Lee, *To Kill a Mockingbird* 224 (1988).  The words are spoken by the character of the attorney, Atticus Finch.

such bias in the courts, detracting from "a course of decisions of long standing directed against racial discrimination in the administration of justice." *Cassell v. Texas*, 339 U.S. 282, 290 (1950) (Frankfurter, J., concurring).**2**     Unfortunately, the majority scants the serious constitutional implications of the problems affecting the jury deliberations in the present case, instead privileging an overly rigid adherence to local rules.  I must therefore respectfully dissent from Parts II.A and II.B of the majority opinion.

I.

The significance of this case cannot be considered in isolation; it must be viewed in the full, historical sweep of events.  Among the Civil War Amendments, "giv[ing] new force and direction" to the "imperative to purge racial prejudice from the administration of justice," *Pena-Rodriguez v. Colorado*, 137 S. Ct. 855, 867 (2017), the Fourteenth Amendment had the "central purpose . . . to eliminate racial discrimination emanating from official sources in the States," *id.* (quoting *McLaughlin v. Florida*, 379 U.S. 184, 192 (1964)).  Its aim was to "secur[e] to a race recently emancipated, a race that through many generations had been held in slavery, all the civil rights" enjoyed by the theretofore dominant race. *Strauder v. West Virginia*, 100 U.S. 303, 306 (1880).  In 1979, Justice Blackmun wrote:

> 114 years after the close of the War Between the States and nearly 100 years after *Strauder*, racial and other forms of discrimination still remain a fact of life, in the administration of justice as in our society as a whole.  Perhaps today that discrimination takes a form more subtle than before.  But it is not less real or pernicious.

*Rose*, 443 U.S. at 558-59.  Another four decades later, that statement still remains, to a troubling degree, true.

---

**2**The words "bias" and "discrimination," while clearly distinguishable as referring to beliefs and practices, respectively, are also closely intertwined.  One group of scholars has referred to the two terms as being linked in a "rhetorical relationship . . . [that] is bidirectional.  Identifying a discriminatory behavior inclines one to view its psychological correlate as a form of bias, and conversely, identifying a psychological state as biased bolsters the condemnation of a discriminatory behavior." R. Richard Banks, Jennifer L. Eberhardt & Lee Ross, *Discrimination and Implicit Bias in a Racially Unequal Society*, 94 Calif. L. Rev. 1169, 1188  n.104 (2006).  In assessing the conceptual relationship, the authors caution against mechanistic assumptions of a causal link between biased belief and discriminatory behavior.  *Id.* at 1187 n.97.

A.

The beginnings of the fight to eliminate racial bias in our American justice system can be traced back to the enactment of the Civil Rights Act of 1875, which prohibited the exclusion of persons from jury service based on race. *See* 18 U.S.C. § 243. The Supreme Court shortly thereafter reiterated the importance of this prohibition. *See Strauder*, 100 U.S. at 310; *Virginia v. Rives*, 100 U.S. 313, 322-23 (1880); *Ex parte Virginia*, 100 U.S. 339, 344 (1880). From these cases emerges a clear theme: "The Equal Protection Clause guarantees the defendant that the State will not exclude members of his race from the jury venire on account of race, or on the false assumption that members of his race as a group are not qualified to serve as jurors." *Powers*, 499 U.S. at 404 (quoting *Batson v. Kentucky*, 476 U.S. 79, 86 (1986)) (citations omitted).

The Supreme Court's seminal decision in *Batson* was emblematic of the Court's "unceasing efforts to eradicate racial discrimination in the procedures used to select the venire from which individual jurors are drawn." *Batson*, 476 U.S. at 85 (citation omitted). Before *Batson*, Supreme Court precedent had made it clear that discrimination based on race was unacceptable in jury composition considerations. The Court had explicitly stated that "[f]or racial discrimination to result in the exclusion from jury service of otherwise qualified groups not only violates our Constitution and the laws enacted under it but is at war with our basic concepts of a democratic society and a representative government." *Smith v. Texas*, 311 U.S. 128, 130 (1940). The Court reinforced this principle in *Swain v. Alabama*, 380 U.S. 202 (1965), *overruled by Batson*, 476 U.S. 79. Although ultimately rejecting the defendant's claim for lack of proof, the *Swain* Court reaffirmed the rule that "a State's purposeful or deliberate denial to Negroes on account of race of participation as jurors in the administration of justice violates the Equal Protection Clause." *Id.* at 203-04 (citations omitted).

*Batson* further revitalized and solidified this rule. There, the Court held that a defendant may raise an equal protection challenge to the use of peremptory challenges at his own trial by showing that the state used them for the purpose of excluding members of the defendant's race. *Batson*, 476 U.S. at 96. *Batson*'s thrust is threefold: First, it protects "the right of the defendant 'to be tried by a jury whose members are selected pursuant to nondiscriminatory

criteria.'" *Holland v. Illinois*, 493 U.S. 474, 491-92 (1990) (Marshall, J., dissenting) (quoting *Batson*, 476 U.S. at 85-86). Second, it protects "the right of a member of the community not to be assumed incompetent for and be excluded from jury service on account of his race." *Id*. at 492 (citing *Batson*, 476 U.S. at 87). Third, it protects "the need to preserve 'public confidence in the fairness of our system of justice.'" *Id*. (quoting *Batson*, 476 U.S. at 87).

Since *Batson*, the Supreme Court has persisted in its quest to minimize the role that race plays in the jury system. In *Powers*, the Court extended *Batson* to allow white criminal defendants to raise a *Batson* challenge to the exclusion of black jurors. *Powers*, 499 U.S. at 404. The Court reached this decision by focusing on the right of potential jurors to avoid exclusion on the basis of race. *Id*. at 406. In that same year, the Supreme Court further expanded *Batson* to apply to civil cases, stating that "[r]acial discrimination has no place in the courtroom, whether the proceeding is civil or criminal." *Edmonson*, 500 U.S. at 630 (citing *Thiel v. S. Pac. Co.*, 328 U.S. 217, 220 (1946)). Shortly thereafter, the Court decided *Georgia v. McCollum*, 505 U.S. 42 (1992), where it extended *Batson* to allow prosecutors to challenge a criminal defendant's use of peremptory challenges. *Id.* at 54-55.[3]

Ultimately, "[t]he *Batson* framework is designed to produce actual answers to suspicions and inferences that discrimination may have infected the jury selection process." *Johnson v. California*, 545 U.S. 162, 172 (2005) (citing *Batson*, 476 U.S. at 97-98). Pre-*Batson* jurisprudence highlights a focus on the right that a criminal defendant—and a litigant in general—has to be tried by a jury that has been selected absent from discriminatory criteria. *Batson* reinforced this goal and introduced two other overarching goals. The cases that have followed underscore the need to guarantee equal treatment for potential jurors. These goals— protection of litigants, of potential jurors, and of public confidence—are threatened by the majority's decision today. As the *Powers* Court so eloquently reminded us, the jury's crucial role in our society is nothing less than to "act[]as a vital check against the wrongful exercise of power by the State and its prosecutors." *Powers*, 499 U.S. at 411 (citing *Batson*, 476 U.S. at 86).

---

[3]The Court also extended *Batson* to the use of peremptory challenges based upon gender. *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 129 (1994).

"The intrusion of racial discrimination into the jury selection process," the Court went on, "damages both the fact and perception of this guarantee." *Id.*

B.

As Justice Blackmun noted, discrimination has survived into our times, and is "not less real or pernicious" for "[p]erhaps . . . tak[ing] a form more subtle than before." *Mitchell*, 443 U.S. at 558-59.  The sense of a shift away from the more explicit prejudice underlying the traditional definition of discrimination has spurred the recent explosion of studies into implicit bias—that phenomenon involving the brain's use of mental associations so deeply ingrained as to operate without awareness, intention, or control.  In their natural operation, implicit biases allow individuals to efficiently categorize their experiences, and these categories allow people to easily understand and interact with their world.  Implicit biases can be positive or negative; it is the negative biases, however, that give rise to problems that we struggle to combat in the law and, more broadly, in our society.

Research has revealed the profusion of implicit attitudes that people hold towards a wide range of characteristics, chief among them the more salient and immutable traits like race and gender.  People have a strong tendency to develop implicit associations between particular social groups and certain qualities or characteristics.  Researchers "have found that the majority of tested Americans harbor negative implicit attitudes and stereotypes toward blacks, dark-skinned people, [and] other[] [groups]."[4]  For instance, there is a "consistent[] implicit[] associat[ion] of "black with negative [qualities] such as *bad and unpleasant*, [or] with negative stereotypes like *aggressive and lazy*."[5]  As relates to the typical American juror, these biases can operate to distort a person's interpretation of the evidence in a case, or the perception of a defendant's guilt or innocence.  For instance, a study found an "apparent[ly] generalizab[le] tendency to interpret actions by a black person as more violent or threatening than the same actions performed by a

---

[4]Robert J. Smith & Justin D. Levinson, *The Impact of Implicit Racial Bias on the Exercise of Prosecutorial Discretion*, 35 Seattle U.L. Rev. 795, 802 (2012).

[5]*Id.*

white person."**[6]** Perhaps the most disturbing aspect of implicit bias is that it operates outside of a person's conscious intent. Such biases often conflict with one's consciously-held, egalitarian values, and indeed are more predictive of our conduct than are those explicitly-held values. This subconscious, involuntary quality of implicit bias makes its potential impact all the more difficult to identify, combat, and rectify.

Implicit biases threaten the very foundation of our criminal justice system. Our system is one that is built on fairness. The right to a fair trial. The right to a trial by jury of one's peers. The right to be assumed innocent until proven guilty. The prevalence of these biases that are so pervasive and involuntary erodes the rights that our Constitution aims to protect, and undermines the advances that our society has made towards eliminating the role that race plays in our criminal justice system. The majority's decision overlooks the far-reaching impact of these biases and, more importantly, the devastating impact that they very likely played in Defendants' trial.

## II.

With this highly charged history and these important principles firmly in mind, I turn to the issues presented in the case at hand. Defendants raised the violation of their right to a fair and impartial jury by way of appealing the district court's refusal to grant their motion for a new trial or, in the alternative, an evidentiary hearing.**[7]** I agree that our review of a district court's denial of a motion for a new trial is for abuse of discretion. *United States v. O'Dell*, 805 F.2d

---

**[6]**H. Andrew Sagar & Janet W. Schofield, *Racial and Behavioral Cues in Black and White Children's Perceptions of Ambiguously Aggressive Acts*, 39 J. Personality & Soc. Psychol. 590, 597 (1980). The authors cautioned that the correlation had been noted, to that point, "only in the case of males observing interactions between males" and welcomed further study on different gender combinations of observers and actors. *Id.* The authors found that black subjects also showed a tendency to interpret black behaviors as aggressive, though the tendency was not as pronounced as among white subjects. The study, which tested black and white 6th-grade students, was an attempt to determine the validity of earlier research showing that the act of shoving another person during a dispute was interpreted as violent by 73% of subjects when the person doing the shoving was black, and by 13% of subjects when the person doing the shoving was white. *Id.* at 590 (citing B.L. Duncan, *Differential Social Perception and Attribution of Intergroup Violence: Testing the Lower Limits of Stereotyping of Blacks*, 34 J. of Personality & Soc. Psychol. 590 (1976)).

**[7]**Technically, Defendant Floyd filed the motion for a new trial and the other two Defendants moved to join in the motion. The district court denied the motion for a new trial and denied the motions as moot. Because the district court based both denials on the same reasons, it is clearer to treat all three as a denial of a motion for a new trial.

637, 640 (6th Cir. 1986); *see also United States v. Shackelford*, 777 F.2d 1141, 1145 (6th Cir. 1985) (relating to a district court's denial of an evidentiary hearing for claims of jury misconduct). The highly deferential nature of this standard, however, does not discharge our responsibility to rectify constitutional errors.

## A.

I begin with the district court's chief reason for denying Defendants' motion for a new trial: that the juror statements were improperly obtained and "amount[ed] to no more than "weakly authenticated juror statements containing vague allegations of 'harassment' and 'verbal abuse.'" *United States v. Floyd*, No. 2:14-CR-126, 2015 U.S. Dist. LEXIS 129263 at *12 (S.D. Ohio Sep. 25, 2015) (citation omitted). As relates to the evidence having been improperly obtained, the district court relied on Southern District of Ohio Local Civil Rule 47.1, made applicable to criminal cases by Local Criminal Rule 1.2, and which provides that "[n]o attorney, party or anyone acting as agent or in concert with them connected with the trial of an action shall . . . contact, interview, examine, or question any juror regarding the verdict or deliberation of the jury in the action except with leave of the Court." Also pertinent here is Rule 606(b) of the Federal Rules of Evidence, which provides that:

> During an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment. The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.

Fed. R. Evid. 606(b)(1).

The undeniable importance of this evidentiary rule does not mean that it is paramount where basic constitutional rights are at issue. This year, the Supreme Court decided *Pena-Rodriguez*, 137 S. Ct. 855, a case where a juror's statement indicated that racial animus was a significant factor in the juror's decision regarding guilt or innocence. The Court held:

> [W]here a juror makes a clear statement that indicates he or she relied on racial stereotypes or animus to convict a criminal defendant, the Sixth Amendment requires that the [Rule 606(b)] no-impeachment rule give way in order to permit the trial court to consider the evidence of the juror's statement and any resulting denial of the jury trial guarantee.

*Id.*at 869.   The Court clarified that "[n]ot every offhand comment indicating racial bias or hostility" will suffice; rather, "there must be a showing that one or more jurors made statements exhibiting overt racial bias that cast serious doubt on the fairness and impartiality of the jury's deliberations and resulting verdict." *Id*.  With regard to racial bias in the jury deliberations here, the majority finds it dispositive that, unlike the situation in *Pena-Rodriguez*, the foreperson "did not make comments showing that animus was [a] 'significant motivating factor' in *her own vote* to convict."   It is true that the *Pena-Rodriguez* Court set, as a requirement for a statement indicating jury bias to trigger judicial inquiry, that "the statement . . . tend to show that racial animus was a significant motivating factor in the juror's vote to convict." *Id.* at 859.  But this does not gainsay that the *Pena-Rodriguez* Court also casts a wider constitutional net, pointing to the appropriateness of a broader inquiry, not into "every offhand comment indicating racial bias or hostility," certainly, but as to whether a statement "cast serious doubt on the fairness and impartiality" of the jury's decision. *Id.*at 869.

That the facts in *Pena-Rodriguez* do not mirror precisely the facts in the present case is readily noted.  In *Pena-Rodriguez*, following a three-day trial, the court gave counsel permission to speak with the jurors.  Two jurors voluntarily spoke to counsel and stated that during deliberations another juror had expressed anti-Hispanic bias towards the defendant and defendant's alibi witness.  According to the jurors, the biased juror had made such comments as he "believed the defendant was guilty because in [the juror's] experience as an ex-law enforcement officer, Mexican men had a bravado that caused them to believe they could do whatever they wanted with women." *Id*. at 862.  The juror also stated, "I think he did it because he's Mexican and Mexican men take whatever they want." *Id*.  The Supreme Court concluded that "[w]hen jurors disclose an instance of racial bias as serious as the one involved in this case, the law must not wholly disregard its occurrence." *Id*. at 870.

The jury foreperson's racial animus in the present case, in contrast, was not aimed directly at the Defendants but, rather, was directed at the two black jurors.  I do not believe, however, that this difference is sufficient to overcome the taint of racial prejudice on the proceedings.  In *Pena-Rodriguez,* the Supreme Court rested its decision on the idea that "[t]he jury is to be 'a criminal defendant's fundamental protection of life and liberty against race or

color prejudice.'" *Id.* at 868 (quoting *McCleskey v. Kemp*, 481 U.S. 279, 310 (1987)).  As such, "[a] constitutional rule that racial bias in the justice system must be addressed—including, in some instances, after the verdict has been entered—is necessary to prevent a systemic loss of confidence in jury verdicts, a confidence that is a central premise of the Sixth Amendment trial right." *Id.* at 869.  This commitment to eliminating racial bias in the jury deliberation process, expressed so forcefully by the *Pena-Rodriguez* Court, applies equally to the present case, where the jury foreperson injected her racial biases explicitly into the deliberative process.  It is hardly a strained inference that, where a juror displays racial bias towards another juror of the same race as the defendant, that juror is incapable of impartially judging the guilt of the defendant.  This inference is a natural, and even necessary, extension of the Supreme Court's reasoning in *Pena-Rodriguez.*

The present case differs from *Pena-Rodriguez,* too, in that counsel here acted in violation both of the district court's express order not to contact jurors and of the district court's local rules.  This conduct played a major role in the district court's denial of Defendants' motion for a new trial or evidentiary hearing.  In *Pena-Rodriguez,* the Supreme Court concluded that the rules of professional ethics and local court rules will guide the practical mechanics of acquiring and preserving evidence, *id.*, and especially noted that defendant's counsel did not seek out the two jurors' allegations of racial bias, *id.* at 870.  Certainly, I cannot condone counsel's violation of the district court's local rules, much less the disobedience of express orders of the court.  Such rules and orders are vital safeguards put in place to protect the privacy of jurors.  Nevertheless, as important as they are, such considerations must bend in the face of possible constitutional violations.  The Supreme Court has cautioned, with regard to evidentiary rules, against "appl[ying] [rules] mechanistically to defeat the ends of justice," instead urging pursuit of "the fundamental standards of due process." *Rock v. Arkansas*, 483 U.S. 44, 55 (1987) (quoting *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973)); *see also Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (important public policy underlying evidentiary rules does not trump the mandates of the Constitution).  Moreover, other avenues—such as sanctions against counsel—are available to punish such blatant disregard for court rules.  The answer, however, cannot be to disregard Defendants' fundamental constitutional right.  Again, the real possibility that such improper bias infected the jury's verdict is sufficient to prevail over counsel's improper conduct.

The district court also based its denial of the motion for a new trial on the fact that after the three days of deliberation, each juror was polled individually and responded that the verdict was unanimous, uncoerced, and a fair reflection of his or her vote. *Floyd*, 2015 U.S. Dist. LEXIS 129263 at *9. The court then dismissed Defendants' challenges as post-conviction recantations. *Id.* at *10. Given the Supreme Court's very clear admonition that racial bias, when left unaddressed, poses a risk of systemic injury to the administration of justice, *see Pena-Rodriguez*, 137 S. Ct. at 868, I believe that the district court's willingness to dismiss evidence of the racial hostility permeating the jury deliberation process in this case led the court into error. And the facts bear witness to this.

The white jury foreperson accused the two black members of the jury of deliberately trying to hang the jury because of their shared race with the Defendants, raising the suggestion that the two jurors were protecting Defendants because "maybe [they] felt [they] owed something to [their] black brothers." The foreperson also stated, "I find it strange that the colored women are the only two that can't see" the defendants' guilt. These comments escalated the tension in the jury room to the point that the marshal's intervention was required. The severity of this situation diminishes the weight properly given to the two black jurors' confirmation that their votes were uncoerced. In essence, the white jury foreperson's comments embody the decades-old concern given voice by Justice Marshall in *Batson*: "Exclusion of blacks from a jury, solely because of race, can no more be justified by a belief that blacks are less likely than whites to consider fairly or sympathetically the State's case against a black defendant than it can be justified by the notion that blacks lack the 'intelligence, experience, or moral integrity' to be entrusted with that role." *Batson*, 476 U.S. at 104-05 (1986) (Marshall, J., concurring) (quoting *Neal v. Delaware*, 103 U.S. 370, 397 (1881)) (citation omitted). Such an implication is prejudicial to the defendant, demoralizing to the juror, and completely antithetical to the truth: "A person's race simply 'is unrelated to his fitness as a juror.'" *Id*. at 87 (quoting *Thiel*, 328 U.S. at 227 (1946) (Frankfurter, J., dissenting)).

The jury foreperson's remarks are characterized by the majority as "racially insensitive." However, what is at issue is not the interpersonal quality of sensitivity (or its absence), but rather the constitutional implications associated with the injection of racial animus and racial

considerations into jury deliberations. Aside from the racial prejudice that the jury foreperson's comments suggest she harbored, also troubling is the possibility that the black jurors may plausibly have felt pressure to swing around to the majority's view and vote to convict in order to demonstrate that they were *not* approaching their obligations as jurors out of racial considerations.

In other words, the foreperson's comments arguably exerted pressure on the two unpersuaded jurors to change their minds, and votes, in order to *disprove* the "belief" alluded to by Justice Marshall in *Batson*, "that blacks are less likely than whites to consider fairly . . . the State's case against a black defendant. . . ." *Id.* at 104. "A juror who allows racial . . . bias to influence assessment of the case breaches the compact [underlying the jury system] and renounces his or her oath." *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 153 (1994) (Kennedy, J., concurring). This caution arguably applies as much to a juror who makes racial considerations an argument in deliberations with fellow jurors, as it does to a juror who votes to convict out of racial animus.

Ultimately, I believe that the evidence of racial animus and harassment presented by Defendants, notwithstanding the undeniable formal improprieties connected with its production, created reasonable grounds to doubt the validity of the jury verdict. I would remand this case to the district court for, at a minimum, an evidentiary hearing on Defendants' claims.

B.

I differ with the majority as well with respect to the *Allen* charges. The majority concludes that the charges were not improper. The *Allen* charge is one that delicately balances the obligation of each juror both to consider carefully the arguments of the other jurors about the proper verdict, and to vote his or her conscience rather than simply acquiesce to the opinions of others. *United States v. Scott*, 547 F.2d 334, 336 (6th Cir. 1977) (citing *Allen v. United States*, 164 U.S. 492, 501 (1896)). Our Court has allowed the use of such charges, but cautions that "[a]ny variation upon the precise language approved in *Allen* imperils the validity of the trial." *Id.* at 337. Because "a defendant has a right to rely on the fact that an ultimate jury disagreement is a permissible result of a trial[, t]he reminder that no juror should merely

acquiesce in the majority opinion is therefore one of the most important parts of the [*Allen*] charge." *Id*.

Defendants' argument is that the district court's first instruction[8] was, in essence, a modified *Allen* charge, which was then exacerbated by the two subsequent *Allen* charges. This argument is persuasive. In its first instruction to the jury, the district court ended by saying: "I would encourage you to resolve the conspiracy issue because *ultimately all these issues have to be resolved.*" This language, similar to language that this Court has rejected in the past, *see United States v. Harris*, 391 F.2d 348, 355 (6th Cir. 1968) (criticizing the district court's statement that "this lawsuit must be decided—it must be decided at some time by some jury"), tends to mislead a jury by failing to inform the jury of its right not to reach a unanimous verdict. "For the judge to tell a jury that a case must be decided is . . . not only coercive in nature but is misleading in fact. It precludes the right of a defendant to rely on the possibility of disagreement by the jury." *Id.*

Contrary to the Government's argument, this coercive instruction in the present case was not "cured" by the subsequent *Allen* charges. Rather, the instruction, followed by two *Allen* charges given in such close proximity to each other, and accompanied by the district court's additions of "listen to one another both carefully and respectfully" and "as mature adults, every one of you has had a disagreement with someone and has been able to work through it at some point in your lives," very likely compounded the coercion. The latter instruction, particularly, by asserting a likeness between a juror's solemn responsibilities and the ordinary process of resolving discord and reaching agreement in everyday life, arguably mischaracterized the legal and constitutional import of a jury's deliberations. The district court's repeated pressing of the jury to continue deliberations exceeded "the limit[] beyond which a trial court should not venture in urging a jury to reach a verdict." *Scott*, 547 F.2d at 336-37.

---

[8]The jury's first note to the district court asked, "If we cannot agree on Count One of conspiracy, can we rule on other counts?" In response, the district court instructed the jury as follows:

> Yes, you may. It is easier in some respects, because there is a certain logic in taking up the issues in the order in which I read them to you in my instructions, but I will not tell you the order in which you have to take up consideration of the issues. I would encourage you to resolve the conspiracy issue because ultimately all the issues have to be resolved.

It is doubtless a task of some difficulty for a court, on appellate review, to weigh the prejudicial impact of a variation of the approved *Allen* charge. *See id.* at 337 (citing *United States v. Flannery*, 451 F.2d 880, 883 (1st Cir. 1971)). Nonetheless, the evidence in this case makes it clear that the cumulative effect of the district court's instructions and *Allen* charges was coercive and likely forced the jury to believe that it was obligated to return a unanimous verdict. In my view, the district court's error is plain, and I would reverse and remand on this issue.

## III.

The history of racial bias in the courtroom is not only a stain on our shared past; its corrosive effects persist to this day. The enduring shadow of bias also dims public confidence in the fairness of the courts. The majority's decision represents a step backwards from the strides we have made towards eradicating this disgraceful legacy from our criminal justice system. For the reasons set forth above, I differ with the majority with regard to the issues of racial animus within the jury and to the *Allen* charges, which, operating in a mutually reinforcing manner, exerted pressure on the two black jurors who were not prepared to vote for a guilty verdict. In combination with the racial animus contained in the jury foreperson's remarks, these circumstances raise serious doubts about the fairness and impartiality of the jury's decision. With regard to the remaining issues in this case, I concur with the majority.